138 F.3d 229
 Mary GLOVER; Lynda Gates; Jimmie Ann Brown; Manetta Gant;
Jacalyn M. Settles; and several Jane Does, on
behalf of themselves and all others
similarly situated, Plaintiffs-Appellees,
v.
Perry JOHNSON, Director, Michigan Department of Corrections;
Florence R. Crane; G. Robert Cotton; Thomas K. Eardley,
Jr.; B. James George, Jr.; Duane L. Waters; The Michigan
Corrections Commissions; William Kime, Director, Bureau of
Programs; Robert Brown, Jr., Director, Bureau of
Correctional Facilities; Frank Beetham, Director, Bureau of
Prison Industries; Richard Nelson, Director, Bureau of
Field Services; Gloria Richardson, Superintendent, Huron
Valley Women's Facility; Dorothy Costen, Director of
Treatment, Huron Valley Women's Facility; and Clyde Graven,
Sheriff, Kalamazoo County; individually and in their
official capacities, Defendants-Appellants.
 Nos. 95-1521, 96-1852, 96-1931 and 96-1948.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 13, 1997.
Decided March 2, 1998.
Rehearing and Suggestion for Rehearing En Banc Denied June 8, 1998.
 
 Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (argued), Detroit Michigan, for Plaintiffs-Appellees in No. 95-1521.
 Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Ann Arbor, MI, Michael Barnhart (argued), Detroit Michigan, for Mary Glover in Nos. 96-1852, 96-1931 and 96-1948.
 Susan Przekop-Shaw (argued), Leo H. Friedman (briefed), Kim G. Harris (briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Defendants-Appellants in No. 95-1521.
 Leo H. Friedman, Lisa C. Ward (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Perry Johnson in No. 96-1852.
 Lisa C. Ward (argued and briefed), Susan Przekop-Shaw, Leo H. Friedman (briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Perry Johnson in No. 96-1931.
 Leo H. Friedman, Lisa C. Ward (argued and briefed), Susan Przekop-Shaw (briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Perry Johnson in No. 96-1948.
 Before: WELLFORD, RYAN, and DAUGHTREY, Circuit Judges.
 RYAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. WELLFORD, J. (pp. 254-256), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 RYAN, Circuit Judge.
 
 
 1
 More than 20 years ago, two separate groups of plaintiffs brought class actions under 42 U.S.C. § 1983 on behalf of all female prison inmates in Michigan. Since then, almost all of the principal players, plaintiffs and defendants alike, have departed the scene through retirement, death, or release from prison. But the two cases live on, and judging from the arguments of the parties and the extensive opinions of the district court, we are not appreciably closer to a resolution than we were two decades ago--and the end does not appear to be in sight.
 
 
 2
 In one of the two suits, which were consolidated by the district court, the plaintiffs challenged "the entire range of treatment programs for female prisoners including educational opportunities, vocational and apprenticeship training, prison industry and work pass programs, wage rates, and library facilities as compared to those offered to male prisoners," as violating the Equal Protection Clause of the Fourteenth Amendment. Glover v. Johnson, 478 F.Supp. 1075, 1077 (E.D.Mich.1979). In the second case, the plaintiffs "claimed that their rights to equal protection and their right to access to the courts ha[d] been violated by [the State of Michigan's] failure to provide the female prisoners ... an adequate law library comparable to those provided for male prisoners." Id. at 1094. After a lengthy trial, the district court found for the plaintiffs in both cases, entered a remedial "Final Order," and has been supervising these aspects of the Michigan women's correctional system ever since. During the course of the district court's supervision, we have entertained more than a dozen appeals; now, the case is before us once again. This time we are presented with three separate appeals which we have consolidated for decision. We are asked to review the district court's judgments (1) denying the defendants' motion to terminate the district court's oversight of the female inmates' educational and vocational opportunities and their access to the courts; (2) granting, in part, the plaintiffs' motion to impose contempt sanctions against the defendants; and (3) granting the plaintiffs' motion for attorney fees.
 
 
 3
 For reasons we will fully explain, we conclude that the judgment of the district court in the first appeal, concerning termination of judicial oversight, must be vacated, and the matter remanded for further proceedings. We will retain jurisdiction. The district court's judgments imposing contempt sanctions and attorney fees will be affirmed in part and reversed in part, and these matters too will be remanded for further proceedings, but as to these, we will not retain jurisdiction.
 
 I.
 INTRODUCTION
 
 4
 Despite the district court's patient, dedicated, and persistent effort over the long history of this lawsuit, it has been unable to accomplish the two tasks before it: (1) achieving compliance on behalf of Michigan's women prisoners with Fourteenth Amendment equal-protection guarantees and with First Amendment access-to-court guarantees, and (2) terminating the federal-court supervision of Michigan's women's prison system. The first of these tasks, of course, is also the plaintiffs' goal in filing this lawsuit; it became the district court's task when the plaintiffs prevailed on the merits in 1979. The second task, on the other hand, is simply a necessary corollary to any extended federal-court oversight of State matters.
 
 
 5
 With all due respect, we believe the district court's inability to achieve these two tasks stems in large part from the court's loss of proper perception regarding its role. Very substantially because of unfocused and misdirected advocacy by both sides in this litigation, and particularly because of the recalcitrant defendants' foot-dragging, the district court has been preoccupied with attempting to force the defendants to comply with the details, even the minutiae, of the intermediate methodologies the court has devised for remedying the constitutional deficiencies it found in 1979. The court has lost sight of the forest for its long-time attention to the trees.
 
 
 6
 We write today not only to decide the specific questions presented by these appeals, but also to clarify the district court's dual missions and, in the process, refocus the attention of all concerned on the tasks at hand: remedying the constitutional infirmities the district court found existed in 1979, and terminating this litigation as speedily as possible.
 
 II.
 BACKGROUND
 
 7
 The protracted history of this case has been sketched on many occasions in the published opinions of the district court and this court. In lieu of still another detailed recitation, we will restate only those facts necessary to an understanding of these consolidated appeals, and leave the reader to the multiple other opinions in order to fill the interstices. But that having been said, in order to afford the reader an adequate understanding of the basis for our decision today, we must nevertheless burden this opinion with a rather extensive review of the district court's orders and the parties' efforts at complying with them.
 
 
 8
 In 1979, the district court conducted a 10-day bench trial, after which it issued a lengthy opinion holding both that "[s]ignificant discrimination against the female prison population occurs in several areas of programming ... in violation of the Fourteenth Amendment," id. at 1083, and that the prisoners' right of access to court was impeded not because there was no law library--one was provided and it was adequate--but by the need for legal training, see id. at 1097. Two years later the court's judgment was supplemented with a "Final Order," which the district court characterized as "the culmination of lengthy negotiations" between the court and the parties, and which set forth in considerable detail the required remedial actions. See Glover v. Johnson, 510 F.Supp. 1019, 1020 (E.D.Mich.1981). The court also stated its intention to "retain[ ] jurisdiction until it is satisfied that the terms of the Orders have been complied with in all respects." Id. The defendants did not file appeals to this court from either the 1979 judgment or the 1981 "Final Order."
 
 
 9
 For seven or eight years following the issuance of the Final Order, the parties were repeatedly before the district court, and before this court a number of times, debating the efficacy of the district court's order seeking to achieve the constitutionality it found lacking in 1979, and the propriety of several of the district court's enforcement methodologies. With each passing year the district court became increasingly less satisfied with the defendants' compliance.
 
 
 10
 Ultimately, but certainly not finally, in 1989, the district court issued a lengthy opinion and order, surveying the defendants' "unwillingness or inability to make progress towards implementing the programs ordered" at earlier stages of the case, and noting that the defendants had consistently "met the use, and threatened use, of [the district court's] contempt power with studied indifference." Glover v. Johnson, 721 F.Supp. 808, 812, 811 (E.D.Mich.1989). The court made detailed findings with respect to the defendants' progress in six areas. The first area was access to the courts, and the remainder were five subcategories of rehabilitative programming: educational programming, vocational programming, apprenticeships, prison industry, and work-pass programs. It concluded that the defendants' efforts fell short of the mark. The court stated:
 
 
 11
 In October 1979, I found the rehabilitative programming then afforded to the Department's female prisoners to be substantially inferior to that offered its male prisoners. I entered an order outlining the required remedy. In 1981, I supplemented that outline with a more detailed decree. That decree was captioned a "Final Order." Now, ten years later, female prisoners are still not receiving the type of equal programming to which they are entitled. As recounted ..., the Department has failed to implement my orders in almost every respect.
 
 
 12
 Id. at 849. Therefore, the court imposed a specially crafted contempt remedy providing for the appointment of a Special Administrator and a Compliance Monitor, which it felt represented the best hope of attaining the "elusive" goal of parity. Id.
 
 
 13
 The defendants appealed this order, but without notable success. In May 1991, this court issued its decision in Glover v. Johnson, 934 F.2d 703 (6th Cir.1991), holding, among other things, that
 
 
 14
 the district court did not abuse its discretion in holding defendants in contempt for noncompliance with the court's 1981 order. We also conclude that the district court's order requiring defendants to appoint a special administrator to develop a remedial plan is not an excessively intrusive remedy.
 
 
 15
 Id. at 705. We elaborated: "The district court did not abuse its discretion in requiring defendants to appoint an administrator to develop the remedial plan," especially in light of the fact that "[t]he history of this case shows a consistent and persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance." Id. at 715.
 
 
 16
 Following this decision, the district court appointed Nancy L. Zang to serve as "Special Administrator of Female Offender Programs," and Dr. Rosemary Sarri to serve as Compliance Monitor. In December 1991, the defendants submitted to the district court a Remedial Plan and a Plan for Vocational Programs and Work Pass, both of which plans had been prepared by Zang at the direction of the district court. The plans assertedly were "intended to assure the constitutionality of the programs provided to female offenders at Crane Correctional Facility, Huron Valley Women's Correctional Facility, Scott Correctional Facility, and Camp Gilman." These institutions, at the time, comprised all of the prison facilities for women in Michigan, although the number, size, and character of the female inmates' facilities have since changed. The plans summarized the court's previous orders, as well as the actions already taken and those proposed by the defendants, and set forth a "project tracking system to facilitate an ongoing review and evaluation." The Remedial Plan contains the following language with respect to implementation, compliance, and termination:
 
 Implementation
 
 17
 Defendants shall implement this remedial plan in accordance with its terms on or before two (2) years from the date of its approval by the Court.
 
 
 18
 ....
 
 Compliance Monitor
 
 19
 Defendants shall monitor the binding provisions of the Remedial Plan. Defendants shall file with the Court and serve upon the Court Monitor and Plaintiffs' counsel quarterly monitor reports until the filing of the final monitor report described herein. The monitor reports shall include the compliance status and the progress of each binding provision set forth in this remedial plan.
 
 
 20
 Within one hundred and twenty (120) days of the expiration of the two (2) year implementation period, Defendants shall file with the Court and serve upon the Court Monitor and Plaintiffs' counsel a final monitor report describing the compliance status of each binding provision set forth in this remedial plan. After filing of the final report, monitoring of the remedial plan shall terminate.
 
 Termination
 
 21
 Defendants shall be in substantial compliance where 75% or more of the binding provisions in each program area set forth in this remedial plan are found in compliance in the final monitor report. Where the final monitor report reflects substantial compliance with the binding provisions in one or more program areas, the jurisdiction of the Court shall be terminated for each of the compliant areas thirty (30) days from the filing of the final monitor report, unless Plaintiffs file a Motion requesting extension of the Court's jurisdiction due to existence of constitutional violations with the program areas set forth in this remedial plan.
 
 
 22
 The Plan for Vocational Programs and Work Pass contains similar language.
 
 
 23
 The Remedial Plan proposed the following actions for the following areas, along with a proposed time line for achieving the goals:
 
 
 24
 Access to the Courts: establish paralegal trainee pay scale; law library status reports due; continue Huron Valley Women's Facility/Jackson Community College paralegal program; contract and deliver training through Kellogg Community College; contract and deliver training through University of Detroit-Mercy; implement eligibility criteria; and establish a method to determine if a sufficient pool of writ writers exists.
 
 
 25
 Educational Programming: assessment--develop guidelines, train staff; planning--develop individualized program plan (IPP) guidelines, design IPP, train staff; develop IPPs for women in associate and baccalaureate degree programs; education files--develop standards; develop postsecondary criteria for enrollment/participation; develop information process; develop procedures for course/degree selection; continue associate and baccalaureate programs at Crane; continue associate program at Scott; begin baccalaureate programming at Scott; establish Jobs Education and Training Council.
 
 
 26
 Apprenticeships: determine program viability at Crane Women's Facility and Scott Correctional Facility; seek court approval for apprenticeships at Crane, Scott, and Huron Valley; modify Joint Apprenticeship and Training Committee at Crane if necessary; establish Joint Apprenticeship and Training Committee at Scott; modify/prepare standards at Crane and Scott; inform, recruit, select and implement apprenticeships at Crane and Scott; determine viability for Huron Valley apprenticeship transfer to Scott; develop plans/paperwork relative to Huron Valley closing; and develop monitoring scheme.
 
 
 27
 The precise goals for vocational and work-pass programs are as follows:
 
 
 28
 Vocational Programs: Review and update curricula; develop guidelines for prerequisite skills; develop IPPs for all vocational students; develop offender profile; design and conduct vocational interest survey; identify viable vocational programs; and develop strategies and implement new programs.Work Pass: Simply proposes that the work pass program "will continue to be offered," with no modifications, because as of December 2, 1991, 29% of eligible women participated, compared with only 12.3% of eligible men.
 
 
 29
 Nowhere in the plans was there any mention of the rehabilitative educational-- or occupational-training opportunities then being provided to male inmates, the criterion against which the district found a denial of equal protection 12 years earlier.
 
 
 30
 The plaintiffs objected to the plans on the grounds that they (1) failed to address issues that were part of the court's prior orders; (2) failed to include proposals to remedy constitutional violations found by the court in its 1989 order; and (3) failed to fully explain the defendants' plan to remedy the issues that were addressed. The defendants apparently responded to the plaintiffs' objections, but never revised their plans. They never, moreover, sought court approval of their plans. And most significantly, the district court never entered an order adopting the proffered plans.
 
 A.
 Motion to Terminate
 
 31
 In December 1993, the defendants filed a motion pursuant to Fed.R.Civ.P. 60(b)(5), seeking to modify the compliance-monitor requirement and the termination language contained in both plans, even though neither had ever been the subject of court approval. Specifically, the defendants sought to change the existing termination language to provide that upon "court approval of the Remedial Plan, or any portion of the Remedial Plan, an order will immediately be entered terminating the court's jurisdiction over the applicable provisions."
 
 
 32
 The district court then held numerous days of hearings, attempting to ascertain the extent of the defendants' compliance. In March 1995, the district court issued its opinion denying the defendants' motion. See Glover v. Johnson, 879 F.Supp. 752 (E.D.Mich.1995). The district court stated:
 
 
 33
 [D]efendants' motion, in reality, seeks to terminate the Plans and to end the role of the Court Monitor. Thus, defendants seek to terminate the case itself. Defendants believe that implementation and monitoring of the Plans have been ongoing; therefore, there is no need for a compliance monitor, and no need to monitor defendants' conduct. Defendants believe the monitoring and reporting requirements outlined in the current Plans, in addition to what defendants have already been subject to during the pendency of approval of the Plans, substantially burden them. They argue that the motion should be granted because they have "substantially complied" with this court's previous orders and with the Remedial Plan and the Plan for Vocational Programs and Work Pass.
 
 
 34
 Id. at 755-56 (footnote omitted). The court then characterized the defendants' position as follows:
 
 
 35
 Defendants argue that the court's active participation in the implementation and monitoring of defendants' compliance with the Plans constitutes changed factual circumstances which make compliance with the Plans more burdensome. Additionally, defendants assert that they did not anticipate that the following acts would take place prior to approval of the Plans: (1) that the court would give permission to implement the Plans while indefinitely delaying approval; (2) that they would be required to submit status reports and respond to numerous inquiries from plaintiffs' counsel; and (3) that the court would become involved in the implementation and monitoring of the Plans.
 
 
 36
 Id. at 756 (footnote omitted).
 
 
 37
 In deciding the motion, the district court first noted that Fed.R.Civ.P. 60(b), the rule under which the defendants made their motion, "is applicable only to final judgments and orders," and that the plans "are neither." Id. Nonetheless, the court reasoned, it could responsibly "adopt[ ] a substitute approach," and simply "assum[e] that the Plans had been de facto approved," and then "determine if defendants are currently in compliance with the Plans." Id. In that case, the requested modifications could be made if "the changed factual circumstances advanced by defendants warrant modification." Id. at 757.
 
 
 38
 The court conducted a review of the terms of the plans, and determined that the defendants were not in substantial compliance, and therefore denied the defendants' motion. We will paraphrase the district court's specific comments, as follows:
 
 
 39
 1. With respect to access to court, the court identified the following "deficiencies": "[N]o method has been developed to determine whether there exists an adequate pool of writ-writers in the prisons. Additionally, information is still lacking about the adequacy of writ-writers and their utilizations.... [T]here is no library currently at Camp Gilman nor a paralegal."
 
 
 40
 2. With respect to educational programming, the court observed: "[T]here still are women in college programming who do not have IPP's prepared. Additionally, there are a number of women who are prevented from taking a full twelve-credit course load because of space problems."
 
 
 41
 3. With respect to apprenticeships, the court identified five programs at Crane, and six at Scott, and noted the defendants' arguments that "they have not been able to fill three of the five Crane apprenticeships due to eligibility requirements," which have excluded approximately 100 women. Placing the blame on the defendants for this inability, the court concluded that the defendants "are clearly not in substantial compliance with the goals of apprenticeship programming as established in the Remedial Plan. Under the Plan, defendants are required to recruit and motivate women to participate in apprenticeship programming." The court suggested that the eligibility criteria employed by the defendants "may discourage women from even applying for apprenticeships."
 
 
 42
 4. With regard to vocational programming, the court characterized its earlier orders as requiring the defendants "to provide vocational programs at all facilities housing members of the plaintiff class." The court observed: "[A]s of June 1, 1994, there were eligible inmates who were not enrolled in vocational programming due to waiting lists. Additionally there are a significant number of women in camps who are not receiving vocational programming although their earliest release dates are more than a year away."
 
 
 43
 5. With regard to work-pass programs, the court found that "[t]here are currently no women being taken out on work pass." Moreover, the court found, "[t]here has been a continued decrease in the number of women going out on community residential placement," a "program [that] was structured to take the place of work pass." Finally, the court observed, work pass "programming is significantly reduced because of more stringent security requirements," and the defendants "have not proposed alternative programming to work pass" in recognition of this reduction.
 
 
 44
 Id. at 757-59 (footnotes and citations omitted).
 
 
 45
 Notably missing from the district court's lengthy opinion is any consideration whether, at the time the opinion was written, the educational, vocational, apprenticeship, and work-pass opportunities then being offered to women inmates were on a constitutional par with those then being offered to men. The court's overall conclusion with respect to the defendants' motion was that "[a]lthough defendants have made significant improvements in a number of areas ..., they have not substantially complied with either of the Plans as a whole." Id. at 759-60.
 
 
 46
 To the district court's credit, it concluded its opinion with a discussion of "finality in these proceedings." Id. at 760.
 
 
 47
 The perplexing issue is: How is finality reached in these public agency-public law cases? ...
 
 
 48
 As it is so often a need in the administration of justice, a balance must be reached. That balance is reached, it seems, when there is substantial compliance with the goals of ... a negotiated settlement.... [T]hat requirement of compliance has not yet completely been reached. That fact may not be used, however, to avoid addressing finality. Even though progress has been slow ..., there has been substantial progress toward finality.
 
 
 49
 It is this court's view that a further test period is still required. That test period can be measured in a discrete time frame.
 
 
 50
 This court, with the aid of its Monitor[ ], will determine within a period of sixty (60) days after December 31, 1996, whether compliance has been substantially accomplished. During the period prior to December 31, 1996, ... the monitor[ ] will perform quarterly reviews which will be submitted to the court and the parties detailing the compliance status in each program....
 
 
 51
 Id. (footnote omitted).
 
 
 52
 In April 1995, the district court entered the following order, pursuant to its March opinion:
 
 
 53
 IT IS HEREBY ORDERED that Defendants' Motion to Amend or Modify the Compliance Monitor and Termination Language in the Remedial Plan and the Plan for Vocational Programs and Work Pass and Defendants' request to terminate the role of monitors and Court jurisdiction is DENIED;
 
 
 54
 IT IS FURTHER ORDERED that until December 31, 1996[,] the Court Monitor shall submit quarterly reports detailing the status of Defendants' compliance with Court orders and the Plans to the Court and the parties;
 
 
 55
 IT IS FURTHER ORDERED that within sixty (60) days after December 31, 1996[,] the Court, with the aid of the Monitor, shall determine whether compliance with Court orders and the Plans has been substantially accomplished through this procedure:
 
 
 56
 1. The Court would first review compliance under the Plans and would dismiss any portions of the Plans for which it found compliance.
 
 
 57
 2. The Court would entertain motions regarding the portions of the Plans for which the Court did not find compliance. In these motions the parties could argue the relevant constitutional standards and show that compliance with the full terms of the Plans should not be required.
 
 
 58
 From the April 1995 order, the defendants filed this timely appeal. Before discussing our conclusions with respect to this, the first of the three matters before us, we turn to the background underlying the second matter on appeal, the contempt proceedings.
 
 B.
 Contempt Proceedings
 
 59
 Following the district court's denial of the defendants' request for termination of the court's jurisdiction, the plaintiffs filed a number of motions claiming that the defendants were in contempt for their alleged continuing, and escalating, failure to comply with various district court orders. At first the district court declined to consider these contempt motions while it experimented with a "compliance committee" consisting of the Special Administrator, the wardens of the Crane and Scott facilities, a representative from the plaintiff class, and the Compliance Monitor. In January 1996, however, it abandoned the experiment, due to the "substantial resistance" of the defendants. The district court then scheduled another round of evidentiary hearings in connection with the still-pending contempt motions. Following the hearings, the court issued a lengthy opinion and order imposing contempt sanctions on the defendants because of their failure to comply, in several respects, with its earlier orders.
 
 1.
 
 60
 a.
 
 Access to the Courts
 
 61
 Addressing first the matter of the female inmates' right of access to the courts, the district court concluded that its "remedial orders requiring Defendants to provide Plaintiffs adequate access" were "embodied in the remedial plan" devised by the defendants in 1991. Glover v. Johnson, 931 F.Supp. 1360, 1363 (E.D.Mich.1996). The court described the pertinent portions of the remedial plan as follows:It provides, in conjunction with [a] Department of Corrections Policy Directive ..., that all general population prisoners shall be entitled to use the main law library at each correctional facility for a[t] least six hours each week. It also requires Defendants to provide paralegal training "until such time as a sufficient pool of trained legal assistants is developed." Finally, the Defendants are required to establish a method to determine when a sufficient pool of inmate paralegals exists to meet the needs of the prisoner population.
 
 
 62
 Id. at 1363-64 (citations omitted).
 
 
 63
 In their motion requesting that the defendants be held in contempt, the plaintiffs argued that the defendants were denying adequate access to the courts for prisoners assigned to custody levels I, IV, and V at Scott. The defendants responded that any limits on library and legal-assistant use were "justified by legitimate security concerns." Id. at 1364. The district court rejected the defendants' arguments, and concluded that the defendants "denied, in violation of the orders of this Court and the Constitution, level I, IV, and V prisoners at [Scott] meaningful and effective access to the courts." Id. at 1367. The court noted that the defendants did "not deny that their denial of level I and level V prisoners access to [the main] law library is contrary to the remedial plan," but instead "argu[e] that they had a legitimate penological interest for their actions and that they have provided adequate alternative means of access." Id. This, the court held, was insufficient to cure their contempt, because it was not within the defendants' province to unilaterally alter a provision of the remedial plan. The court also rejected the stated security concerns of the defendants, opining first that the security concerns alone did not render it impossible to provide meaningful access to the courts, and second, that while "[p]rison security is unquestionably a legitimate penological interest," the defendants' "refusal to allow level I and V prisoners access to the main law library does not bear a rational connection to prison security," in the absence of evidence that Level I prisoners have proven historically to be a security threat. See id. at 1370.
 
 
 64
 b.
 
 Vocational Programming
 
 65
 The district court next turned to the defendants' actions with respect to vocational programming. The court observed that its prior orders required the defendants to provide six vocational programs at Scott. The plaintiffs' position in their contempt motion was that the defendants "ha[d] unilaterally discontinued court ordered vocational programming," and that they "den[ied] programming to prisoners at [Scott] on the basis of custody level." Id. at 1372.
 
 
 66
 The district court found that the defendants had discontinued three vocational programs--auto mechanics, building trades, and institutional maintenance; that Level I inmates had systematically been denied vocational programming; and that particular Level IV and V inmates had in the past been denied vocational programming, but that the defendants' "prerequisites for prisoner participation in vocational programming do not presently discriminate based upon custody level." The court then concluded that the defendants were "in contempt of [the district court's] orders requiring six vocational programs" at Scott because they were only providing four programs, and further that the defendants had "denied court ordered programming to level I, IV and V prisoners based upon their custody level." Id. at 1373, 1376. With regard to the latter conclusion, the court noted that the defendants themselves admitted denying programming based on custody level, but argued that this was justified because of security concerns. The district court rejected this argument, again stating that the segregation policy "does not mandate denial of programming," and also noting that the policy itself includes an exemption for vocational programming. Id. at 1376. The court concluded, however, that the defendants had purged themselves of contempt in this particular regard by no longer denying programming based on custody level.c.
 
 Camp Branch
 
 67
 The court next turned to allegations regarding Camp Branch. There, the plaintiffs' allegations related to the defendants' failure to provide "off-grounds programming"--that is, public works and work-pass programs--to camp inmates, and to the defendants' alleged denial of access to "educational, vocational, and apprenticeship programming." The court asserted that its "1979 order and ... 1981 orders required Defendants to provide work pass and public works programming at all prisons and camps housing members of the plaintiff class." Id. (emphasis added). It further noted that while the defendants are not required to provide vocational, apprenticeship, or college programming at camp facilities, it has nonetheless "been the long-standing commitment of Defendants that qualified prisoners who are placed in the camps may transfer to a facility providing court ordered educational, vocational, and apprenticeship programming not available in the camp." Id. (emphasis added).
 
 
 68
 The district court found that the defendants were "in contempt of several ... orders concerning camp facilities," as follows: (1) by not providing a work-pass and public-works program until after the plaintiffs filed a motion to compel; (2) by not permitting the transfer of "eligible prisoners at Camp Branch who request vocational, apprenticeship, or prison industry programming to a facility which provides these programs"; and (3) by transferring new inmates directly to camps without allowing them to enroll in programming or testing them for eligibility. Id. at 1378.
 
 
 69
 d.
 
 Apprenticeship Programs
 
 70
 Finally, the district court addressed apprenticeship programs. The court stated that the remedial plan obligated the defendants to provide five "meaningful" apprenticeships at Crane, as well as to actively "recruit prisoners for the apprenticeships." Id. at 1379. The court also relied on a 1993 order for the proposition that "[t]he mere posting of apprenticeship openings was ... insufficient," and the defendants were instead "specifically required to assist in motivating inmates to apply for apprenticeships." Id.
 
 
 71
 The district court concluded that the defendants were in contempt of the remedial plan for failing to provide "the quantity [and] the quality of apprenticeships that [the district court] ha[d] ordered." Id. at 1382. With regard to quantity, the defendants had never filled one apprenticeship, electrician maintenance, and two others, landscape gardener and building maintenance, were filled "[i]n a manifest scramble," only after the plaintiffs filed a contempt motion. Further, it specified, "not one inmate has completed an apprenticeship at Crane since they were first ordered." Id. (emphasis omitted). With regard to quality, the court concluded, the amount of on-the-job training was insufficient and the teaching was "uneven." Id. at 1383.
 
 2.
 Sanctions
 
 72
 The district court then turned to the question of appropriate sanctions, and concluded that there was "no alternative to stimulate compliance but to impose significant monetary contempt sanctions." Id. at 1384. It therefore imposed a $500-per-day fine for contempt in connection with each of (1) access to the courts; (2) vocational programming; and (3) apprenticeship programs, for a total of $1500 per day, until the attainment of compliance. These fines were set to increase in approximately two-and-a-half months, to $5000 per day for each violation, for a total of $15,000 per day.
 
 
 73
 The defendants filed another appeal, and, following the defendants' contemporaneous motion, we stayed the district court's order.
 
 III.
 ANALYSIS
 
 74
 With that background, and before taking up the third matter on appeal--attorney fees--we turn now to our discussion of the termination of federal-court supervision and contempt issues.
 
 A.
 Motion to Terminate
 
 75
 In its initial 1979 decision, the district court appears to have recognized the extraordinary and sensitive nature of its undertaking:
 
 
 76
 The possibility of judicial intervention in matters of State concern must be approached cautiously. Given the typical complexity of the problems in operating a prison system, a policy of deference to the decisions of responsible State officials is required.
 
 
 77
 Glover, 478 F.Supp. at 1079. And the court correctly identified the remedial goal to be achieved in this litigation--parity in the treatment of male and female prisoners:
 
 
 78
 The term "parity of treatment" describes concisely the standard to which ... the State ought to be held in its treatment of female prisoners. In other words, Defendants here are bound to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men[,] i.e., equivalent in substance if not in form unless their actions ... bear a fair and substantial relationship to achievement of the State's correctional objectives.
 
 
 79
 Id. (emphasis added).
 
 
 80
 We conclude that in the course of its supervision of this litigation, the district court has lost sight of the standard it correctly identified in 1979 and, perforce, has lost sight of its goals. To reiterate, those goals are (1) remedying constitutional infirmities through achieving parity of treatment for men and women and ensuring access to the courts for women, and, as soon as that is accomplished, (2) terminating federal judicial involvement.
 
 
 81
 As an initial matter, we note that to approach the issues before us in any straightforward manner is difficult, because the case comes to us as a morass of procedural irregularity and the parties' obfuscation of the issues. The defendants' characterization of their motion below as a request for Fed.R.Civ.P. 60(b) relief, and their evasiveness as to what, precisely, is the underlying judgment the district court was being asked to review is only the beginning of the procedural imprecision that has burdened the district court's action as well as our own. One complication we face is that it is unclear whether the remedies for the unconstitutional conditions of confinement the district court found have been set forth in (1) a consent decree or in (2) a court-imposed judgment following full litigation. This inquiry is critical; whether it is one or the other determines the appropriate standard for termination of federal-court oversight, and the standards are not the same. Compare Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) with Knop v. Johnson, 977 F.2d 996 (6th Cir.1992). If the defendants' Rule 60(b) motion was addressed to the 1981 Final Order, we are faced with the parties' dispute as to whether the Final Order is a consent decree. But if the defendants' motion is instead addressed to the remedial plans, a position that both parties adopt and abandon at various instances in their briefs, we are faced with still another problem: the plans were never approved by the district court, and thus were not "final judgment[s][or] order[s]" under Rule 60(b). We are left to consider, then, the effect of the district court's ipse dixit that the remedial plans were "de facto" approved at the time it denied the Rule 60(b) motion.
 
 
 82
 Although the parties have failed to definitively articulate which of the several "documents" considered by the district court is the appropriate subject of our analysis, we find it possible to bypass that inquiry. We conclude that in no event is any of the underlying documents a "consent decree" that could hold the defendants to a higher compliance standard than what is otherwise constitutionally mandated. First, considering the 1981 Final Order, we see nothing in the record to suggest it is a consent decree. The district court has never labeled it as such and the parties are unable to agree that it is. And we note that while there may have been negotiations among the district court and the parties about the precise terms of the 1981 Order, that alone does not transform it into a consent decree. Instead, all indications are that it was imposed on the defendants after their fully litigated defeat. Considering next the remedial plans, we conclude that these cannot be consent decrees for two reasons: (1) as the plaintiffs themselves stated, they were objected to by the plaintiffs, and (2) they were never adopted by the district court as its own order prior to its decision declining to amend them.
 
 
 83
 We proceed, then, from the premise that the defendants' actions are not constrained by a consent decree, but rather, by an order of the district court to which the defendants have never consented. That being so, our standard of review of the district court's denial of the defendants' motion to terminate judicial oversight is whether the constitutional violations the district court found in 1979, denial of "parity of treatment ... of female prisoners" and denial of constitutionally mandated access to the courts, continue to exist today. The district court and the parties have failed to attend to this question; in fact, it is not directly the question that the defendants have put to us in this appeal. It is, however, the question we must necessarily answer in order, in turn, to answer the question the defendants have asked: whether the district court's supervision of this suit should be terminated. Unfortunately, the attention of all concerned--the district court, the parties, and this court as well--has been consistently misdirected to an inquiry into whether the state has complied with the details--every jot and tittle--of the requirements of the remedial plans and the district court's multitudinous orders.
 
 
 84
 To some degree, this misdirection is understandable. It was necessary for the district court, once it found constitutional violations, to develop a specific methodology by which constitutional compliance could be attained and maintained. The intermediate steps it has devised to achieve the compliance, however, have become the focus of everyone's attention; the ultimate goal toward which those compliance measures have been directed appears to have been largely ignored. "Getting there" has obscured where "there" is.
 
 
 85
 The lengthy pendency of this case has resulted in monumental changes in circumstances. Not only have most of the named parties departed the scene, but there have been altered educational opportunities for all inmates, changes in custodial philosophies and facilities, and shifting and evolving educational and occupational interests. The court system, necessarily a slow-moving and even ponderous institution, is ill-equipped to adapt itself to this lack of stasis. In its understandable frustration with the problems surrounding compliance with the extensive details of its many orders and plans, the district court has imposed still more obligations on the defendants, and compliance has become a moving target.
 
 
 86
 Properly conceived, the district court's mission need not be so elusive. Its duty is not to develop a minutely detailed program for the women's prisons and to enforce every facet of its terms. It is a truism that "[j]udicial oversight over state institutions must, at some point, draw to a close." Johnson v. Heffron, 88 F.3d 404, 407 (6th Cir.1996). The challenge, it appears, is to remember that terminating judicial oversight is an objective to be affirmatively strived for, not simply an event that we welcome if it happens to occur. Cf. Missouri v. Jenkins, 515 U.S. 70, 88-89, 115 S.Ct. 2038, 2049-50, 132 L.Ed.2d 63 (1995).
 
 
 87
 To restate the matter for purposes of emphasis, the federal court's authority--the district court's and this court's--to intrude itself into the operation of Michigan's prison system is limited to assuring (1) that sufficient parity is achieved between male and female inmates in matters of educational and vocational opportunities as satisfies the demands of the Equal Protection Clause of the Fourteenth Amendment, and (2) that female inmates have the level of access to the courts that is constitutionally required under the First Amendment. See Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Consideration of whether these ultimate goals have been accomplished has been notably absent from the district court's pronouncements and the parties' advocacy. But without a definitive finding by the district court as to these matters, we are simply unable to assess whether, as the defendants assert, it is now proper to terminate federalcourt intervention. Cf. Rufo, 502 U.S. at 389, 112 S.Ct. at 762-63.
 
 
 88
 All involved in this litigation must bear in mind that the details of the district court's remedial plans and orders are not ends in themselves; they are only a means to an end. If the defendants can demonstrate that they have remedied the constitutional violations found in 1979, even without compliance with the details of previous orders or plans, they must be permitted to do so. And if they do so, federal-court oversight must terminate. But that is not to say that if the State has culpably failed to comply with particular district court orders, it should not be held accountable through contempt proceedings. Validly entered court orders, even if later shown to be unnecessary, must be obeyed, under pain of contempt.
 
 
 89
 We wish to cut the Gordian knot presented by this aging litigation, but to do so, we must be presented with sufficiently detailed findings of fact and conclusions of law addressing whether the defendants have achieved the parity of educational and vocational opportunity and the requisite access to court that the district court found lacking in 1979. Therefore, we must remand to the district court for further proceedings, and shall mandate the following.
 
 
 90
 Within 120 days following issuance of this opinion, the district court shall conduct hearings and receive evidence, including stipulations by the parties, in order to determine with particularity the educational, vocational, apprenticeship, and work-pass opportunities presently being provided (1) to male inmates and (2) to female inmates in the Michigan correctional system. The district court will then make particularized findings of fact and conclusions of law determining whether the male and female inmates are presently being provided sufficiently comparable education, vocational, apprenticeship, and work-pass opportunities as to satisfy the requirements of the Equal Protection Clause of the Fourteenth Amendment. In undertaking this task, the district court must take into account the present conditions of custody and population size at various institutions; any differences in educational and vocational interests between male and female inmates; available educational and vocational training resources; and such other considerations as the district court may deem appropriate. To the extent that, on the basis of such findings of fact and conclusions of law, the district court finds compliance with the Equal Protection Clause of the Fourteenth Amendment, it will terminate its exercise of jurisdiction over the defendants as to those matters. Should the court determine, however, that the requirements of the Equal Protection Clause of the Fourteenth Amendment are not being met as to any of the foregoing, it will explain its reasons for such conclusion and it will identify with particularity the measures it deems necessary to assure equal protection for female inmates.
 
 
 91
 Next, the district court must also, within the same period of time, conduct hearings and receive evidence, including stipulations by the parties, to determine with particularity whether female inmates are presently being denied access to court as guaranteed by the First Amendment, as that entitlement is authoritatively interpreted by the Supreme Court in Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174. Should the court determine that the requirements of the First Amendment are not being met, it will explain its reasons for such conclusion, and it will identify the particulars in which female inmates are being denied the access to court that is required by the Constitution, and likewise identify with particularity the measures it deems necessary to assure that such access is given.
 
 
 92
 The district court's findings of fact and conclusions of law will be reduced to writing and filed with this court not later than 150 days following the date of issuance of this opinion.
 
 
 93
 We retain jurisdiction as to this aspect of the case.
 
 B.
 Contempt Proceedings
 
 94
 We turn now to the second of the matters appealed, the contempt sanctions imposed by the district court, which we review for an abuse of discretion. See Glover, 934 F.2d at 710.
 
 
 95
 In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order.
 
 
 96
 A litigant may be held in contempt if his adversary shows by clear and convincing evidence that "he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."
 
 
 97
 Id. at 707 (citation omitted). It is the petitioner's burden--here, the plaintiffs'--to make a prima facie showing of a violation, and it is then the responding party's burden to prove an inability to comply. See Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir.1995). This court has explained:
 
 
 98
 [T]he test is not whether defendants made a good faith effort at compliance but whether "the defendants took all reasonable steps within their power to comply with the court's order."
 
 
 99
 [G]ood faith is not a defense to civil contempt. Conversely, impossibility would be a defense to contempt, but the Department had the burden of proving impossibility, and that burden is difficult to meet. Although diligence is relevant to the question of ability to comply, the Department's evidence of diligence alone does not satisfy that burden.
 
 
 100
 "[I]nability to comply would be a defense ... but defendants would be expected ... to show this 'categorically and in detail.' "
 
 
 101
 Glover, 934 F.2d at 708 (citations omitted).
 
 1.
 
 102
 a.
 
 Access to Court
 
 103
 The district court's finding of contempt and imposition of sanctions with respect to the defendants' failure to meet the district court's requirements for assuring the plaintiffs' access to the courts must be reversed. The court's findings were based entirely on the defendants' failure to comply with the terms of the remedial plans. The existence of a "definite and specific order" that has been disobeyed is a prerequisite to the imposition of contempt sanctions, Glover, 934 F.2d at 707, and the remedial plans simply do not satisfy that requirement. Even if it may be assumed, arguendo, that the district court effectively adopted the remedial plans at the time it denied the defendants' motion to terminate, it did not, and could not, do so nunc pro tunc. Thus, at the time of the defendants' alleged "violations" of the remedial plans, the remedial plans were not orders of the court. Therefore, the defendants were not in contempt by failing to adhere to their terms.
 
 
 104
 b.
 
 Vocational Programming
 
 105
 According to the district court there was only one basis for imposing sanctions with respect to its findings that defendants failed to provide adequate vocational programming: reduction in programs from the required six to four. The defendants argue that the district court had been ambiguous about how many vocational programs it would require. We do not agree. The district court was repeatedly explicit that it required six separate vocational programs for female inmates. The record is equally clear that the defendants offered only four programs. See Glover, 931 F.Supp. at 1373. Therefore, this aspect of the district court's contempt judgment is affirmed.
 
 
 106
 c.
 
 Camp Branch
 
 107
 The district court found the defendants in contempt and imposed sanctions in part due to the defendants' failure to comply with the requirements of the court's 1979 order concerning off-grounds programming at the women's prison camp. The district court was mistaken; in 1979 Michigan did not have any prison camps for women. See Glover, 478 F.Supp. at 1093-94. In 1981, however, the district court did order that "educational programs shall be available to women inmates at [camps] on the same basis as available at camps housing male inmates." Glover, 510 F.Supp. at 1024 (emphasis added). However, it never mentioned off-grounds programming for Camp Branch. The defendants are not, therefore, in contempt for failing to provide a work-pass or a public-works program.
 
 
 108
 The district court also faulted the defendants for not permitting transfers upon request of Camp Branch prisoners to facilities that provide vocational, apprenticeship, or other similar programming. This is not a proper basis for a contempt sanction, however, because by the district court's own reasoning, the defendants were not required to do so by court order; it had simply been their "long-standing commitment." Glover, 931 F.Supp. at 1376. Likewise, the defendants are not subject to sanctions for putting new inmates directly into camps without allowing them to enroll in programming, as this too was never a court-ordered requirement.
 
 
 109
 d.
 
 Apprenticeships
 
 110
 We turn, finally, to the district court's contempt sanctions with regard to apprenticeship programming. A large part of the district court's reasoning depended on its findings that the defendants had violated the remedial plans and this, as we have already explained, is not a proper foundation for contempt sanctions.
 
 
 111
 The district court also asserted, however, that an order it issued in 1993 required the defendants to actively recruit inmates for apprenticeships, rather than simply to post availability notices, and on this basis, it also found the defendants in contempt. We must disagree. The order in question reads in pertinent part as follows:
 
 
 112
 Although plaintiffs may not specifically raise this issue, I shall take this opportunity to express my displeasure with defendants' procedures of communicating information about apprenticeship openings to the inmates.... Simply posting a notice on a bulletin board for two weeks advertising the opening of an apprenticeship, or engaging in very informal and verbal notification of such openings, is insufficient. Defendants must somehow attempt to motivate the inmates to apply for an apprenticeship opening.... While I am not ordering defendants to create yet another comprehensive plan ..., I am strongly urging the Department of Corrections to show more willingness to adhere to its purpose as reflected in its name: correct the problem. The problem, perhaps, is the inmates' lack of motivation to apply for such apprenticeships because, in part, they are unaware of the benefits gleaned from a meaningful apprenticeship. Merely posting a flyer announcing an opening in an apprenticeship program to inmates unaware of its positive aspects is an insufficient attempt to correct the problem.
 
 
 113
 (Emphasis added.) We find several elements of this order disturbing. In the first place, noncompliance with the terms of this order is not a proper basis for a finding of contempt and the imposition of sanctions because, as the ruling itself states, it does not "order" the defendants to do anything. The defendants cannot be held in contempt and fined for failure to heed what the district court "strongly urg[ed]"; a party may be found in contempt for disobedience of a court's lawful order, but not for disregarding its "urging."
 
 
 114
 More fundamentally, however, we view this order as an example of the loss of focus in these proceedings. It is beyond peradventure that constitutional equal protection mandates do not require the defendants to "motivate" inmates into expressing interest in apprenticeship programs. The district court is not, and is not expected to be, an expert in matters of the inmates' interests. The appeal of an apprenticeship to inmates, and the psychosocial reasons why inmates may not be prepared to take advantage of certain programs, are matters to be left to the exclusive domain of the State, not the federal courts. In engaging in this type of judicial micromanagement, the district court far exceeded its authority.
 
 2.
 
 115
 Because we affirm only one small part of the district court's contempt order, it is necessary to remand to allow the district court to redetermine appropriate sanctions.IV.
 
 ATTORNEY FEES
 
 116
 We turn, finally, to the third of the consolidated appeals: the district court's award of attorney fees to the plaintiffs. This appeal presents two issues for our consideration: whether the district court (1) erred in concluding that the Prison Litigation Reform Act of 1995, Pub.L. No. 104-134, 110 Stat. 1321 (1996), does not apply to limit the fees incurred by the plaintiffs between July and December 1995, or (2) abused its discretion in awarding attorney fees to the plaintiffs for certain categories of work. We conclude that the district court correctly resolved the issue regarding the applicability of the PLRA. We also conclude that the court did not abuse its discretion with respect to most of the attorney fees it ordered. However, we will vacate that part of the court's order awarding fees for advocacy by the plaintiffs' attorneys on behalf of inmates who were allegedly retaliated against by the defendants as a result of their participation in this lawsuit, because, with respect to that award, the district court abused its discretion.
 
 A.
 
 117
 In 1985, the district court entered the following order with respect to attorney fees:
 
 
 118
 IT IS HEREBY ORDERED that Plaintiffs are entitled to attorney fees and that requests for such fees shall be submitted to opposing counsel every six months. Defendants will have twenty-eight days in which to contest the amount of the fee request.
 
 
 119
 The defendants stipulated to entry of this order.
 
 
 120
 The district court subsequently interpreted this order as meaning the plaintiffs were entitled to attorney fees for post-judgment matters, irrespective of whether they actually prevailed on a particular issue:
 
 
 121
 I will not now revisit the decision to award plaintiffs post-judgment attorney fees. The parties stipulated to the entry of this order four years ago, and since then have abided by their agreement. While 42 U.S.C. § 1988 does provide that prevailing parties in civil rights suits may receive attorney fees, defendants should have voiced this objection in 1985. Neither this statute nor my order requires me to redecide the prevailing party issue every six months throughout this prolonged litigation. Rather, the order states plaintiffs are entitled to attorney fees.
 
 
 122
 And in 1987, the court ruled, in response to a number of objections by the defendants regarding attorney fees, that its 1985 order entitled the plaintiffs to attorney fees for any activity related to "monitoring" the defendants' compliance: "Plaintiffs' counsel are charged with responsibility for monitoring compliance with this Court's judgment requiring parity of programming between male and female inmates in the custody of the Michigan Department of Corrections."
 
 
 123
 On February 1, 1996, the attorneys for the plaintiffs sent a letter to defense counsel communicating their fees and costs for the six-month period between July 1 and December 31, 1995. Attorney Michael Barnhart submitted billing records totaling 122.90 hours, and attorney Deborah LaBelle submitted billing records totaling 497.15 hours. On February 27, the defendants responded, objecting generally to a number of charges, but without any elaboration. The objections that are at issue in this appeal are objections to work relating to several appeals to this court filed by the defendants; fees for conferences between Barnhart and LaBelle that the defendants assert amount to "double billing"; and "any fees in non-Glover related issues."
 
 
 124
 On March 11, 1996, the plaintiffs filed their petition for attorney fees incurred between July 1 and December 31, 1995. With respect to the so-called double-billing issue, the plaintiffs' petition specifies:
 
 
 125
 Defendants' objections list dates of alleged consultation between counsel. Two of the listed dates for Ms. LaBelle do not concern any communication, discussion or meeting with Michael Barnhart. (11/12/95, 11/15/95). The remaining dates total 13.70 hours for a six-month time period in which counsel spent conferring, discussing and dividing issues in this case.
 
 
 126
 The defendants' response did not dispute or otherwise even address these assertions. Indeed, their district-court brief with regard to this issue simply stated:
 
 
 127
 Counsel for Plaintiffs, on numerous occasions, have repeatedly told the Court that there has been a definitive assignment of duties and no duplication should take place. Defendants once again object to the repeated duplication of attorneys [sic] fees set forth by Plaintiffs' counsel. Such objections are not waived nor barred by Plaintiffs' reliance on this Court's [prior decisions], which dealt specifically with the factual issues presented to the Court solely at that time. Despite Plaintiffs' counsels' protestations to the contrary, the prior rulings on separate attorney fees issues are not controlling.
 
 
 128
 The defendants' only other support for their claim that plaintiffs' counsel were "double billing" was the attachment of their February 27 letter.
 
 
 129
 On April 26, 1996, the Prison Litigation Reform Act of 1995 was signed into law. Certain provisions of the PLRA relate to attorney fees in prison litigation. On May 7, 1996, the defendants filed a supplemental brief, inviting the court's attention to the existence of the PLRA, and arguing that its attorney-fee provisions should have retroactive effect with respect to the plaintiffs' then-pending petition for attorney fees.
 
 
 130
 On May 9, 1996, the district court held a hearing on the plaintiffs' petition, and on May 31, 1996, it entered an opinion and order. Rejecting the defendants' argument that the PLRA applied to the plaintiffs' attorney-fee request, the court then addressed the defendants' specific objections to particular fees. It first rejected the defendants' objections to fees for time spent by plaintiffs' counsel in consultation with each other:
 
 
 131
 [Defendants] object to time spent by Deborah LaBelle and Michael Barnhart, counsel to the plaintiff class, in consulting, conferring, or discussing matters between themselves. The hours objected to are thirteen in a period of six months between July 1, 1995[,] through December 31, 1995. Again, as I have in the past, I find that these hours[,] "given the magnitude and the complexity of this case, ... [are] at least reasonable and probably necessary."
 
 
 132
 (Citations omitted.)
 
 
 133
 Next, the court rejected the defendants' argument that they should not be responsible for fees in connection with an aborted appeal of various orders:
 
 
 134
 Defendants object to the payment of fees incurred in the ... Sixth Circuit.... These [three] appeals all stemmed from this court's orders establishing a Compliance Committee in order to achieve finality in this case. It was this court's purpose, because of the excessive litigiousness that surrounded compliance with this court's orders, that a new approach be taken. That approach was to "take the lawyers out of the case" and have the Wardens of the two women's prisons, the Special Administrator, the Court Monitor and a representative of the plaintiff class meet and resolve these complex issues. The procedure adopted by this court began to founder ... and, thus, it was necessary to disband this approach. When the court vacated its orders establishing the Compliance Committee, plaintiff[s'] counsel filed a motion to dismiss these appeals that the court's order had generated. Initially the defendants opposed the dismissal but then, on stipulation, agreed to voluntarily dismiss the appeals. This was done only after the submission of briefs in the Sixth Circuit.
 
 
 135
 Even though defendants objected to the court's orders for a Compliance Committee ... and appealed these orders, which they subsequently voluntarily dismissed, they argue that the plaintiff class is not the prevailing party and, therefore, the fees cannot be ordered paid.
 
 
 136
 The argument is rejected, and the defendants are ordered to pay all fees in Appeal Case Nos. 95-1903, 95-2037 and 95-2120.
 
 
 137
 Finally, the district court rejected the defendants' objections as to payment for "non-Glover " issues:
 
 
 138
 Defendants object to the payment of 11.15 hours, which they argue concerns issues not related to the Glover case. It appears that defendants are engaged in hair-splitting. One so-called non-Glover issue arose out of a claim of retaliation by an inmate, a member of the class who claimed that her jewelry had been confiscated as contraband after she participated in this case; and another inmate similarly situated was apparently removed from her prison detail. Plaintiffs' class counsel pursued these matters with defendants' counsel, and I am informed that both these actions were reversed. Another claimed issue on retaliation involved complaints with regard to excessive heat at Camp Branch. The complainants were two women inmates who received "misconducts" for complaining; and, when plaintiffs' class counsel brought this issue to defendants' counsel, the two women inmates did receive rehearings and their "good time" credits were restored. A third so-called non-Glover issue involved plaintiffs' class counsel Michael Barnhart's appearance at legislative hearings. Barnhart appeared at the legislative hearings because matters regarding the Glover case were discussed by the Director of the Department of Corrections. It appears to me that Barnhart properly acted in monitoring these matters inasmuch as they relate directly to this case.
 
 
 139
 Thus, the objection of defendants to the payment of 11.15 hours to plaintiffs' class counsel is overruled.
 
 
 140
 The defendants filed a timely appeal of this order. They also filed a motion for approval of a bond staying payment of the attorney fees. While the plaintiffs agreed to a bond for part of the attorney fees, they took the position that the defendants should have to pay the undisputed amount, covering 228.40 hours. The district court agreed with the plaintiffs' position, and entered one order on July 12 allowing the defendants to post a bond for part of the amount they owed--$74,935.40--but simultaneously entered another order directing payment by July 19 of $33,127.51, for what it termed "undisputed fees and costs."
 
 
 141
 The defendants did not pay this amount, but before they filed a notice of appeal, the district court--four days after the July 19 deadline--issued an order to show cause why the person responsible for compliance should not be held in contempt, and set a hearing for August 2. The district court also set a show-cause hearing for the same date with respect to the defendants' failure to file the stay bond that had been approved.
 
 
 142
 The defendants then filed a motion for a stay of all the orders at issue: the original attorney-fee order, the bond order, the order directing payment of some attorney fees, and the two show-cause orders. This court granted the motion on July 30, 1996. After entry of the stay, the defendants filed a notice of appeal of the orders from which they had not yet appealed. These appeals were then consolidated by this court.
 
 B.
 1.
 
 143
 As a general matter, attorneys for plaintiffs pursuing actions under 42 U.S.C. § 1983 are entitled to attorney-fee awards pursuant to the guidelines of 42 U.S.C. § 1988:
 
 
 144
 In any action or proceeding to enforce a provision of section[ ] ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs.
 
 
 145
 42 U.S.C. § 1988(b). This statute, however, must now be read in conjunction with the PLRA, which took effect on April 26, 1996, at the time it was signed into law. See Wright v. Morris, 111 F.3d 414, 417 (6th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997). Section 803(d) of the PLRA provides the following with respect to attorney fees in prisoner suits:
 
 
 146
 (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that--
 
 
 147
 (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and
 
 
 148
 (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
 
 
 149
 (2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.
 
 
 150
 (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18, for payment of court-appointed counsel.
 
 
 151
 (4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.
 
 
 152
 42 U.S.C. § 1997e(d) (emphasis added).
 
 
 153
 The defendants have argued that the underscored portions of the PLRA affect this case. They claim, first, that the plaintiffs did not "establish[ ] how each hour they charged was directly and reasonably incurred in proving an actual violation of constitutionally protected rights," see 42 U.S.C. § 1997e(d)(1)(A) & (B)(ii), and second, that the plaintiffs should be limited to an hourly rate of $112.50 pursuant to section 1997e(d)(3). This challenge raises a purely legal question of the retroactivity of the PLRA, that is, a question of statutory interpretation. Our review is, accordingly, de novo. See United States v. TRW, Inc., 4 F.3d 417, 421 (6th Cir.1993); see also Borregard v. National Transp. Safety Bd., 46 F.3d 944, 945 (9th Cir.1995); cf. Freeman v. Laventhol & Horwath, 34 F.3d 333, 342 (6th Cir.1994).
 
 
 154
 In Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court established the analytical approach we must follow. Landgraf instructs that we first determine whether Congress "expressly prescribed the statute's proper reach." Id. at 280, 114 S.Ct. at 1505. Absent an express command that a statute operates retroactively, a "traditional presumption" against retroactivity comes into play so that the statute will not be applied. Id.; see Wright, 111 F.3d at 418; Jensen v. Clarke, 94 F.3d 1191, 1202 (8th Cir.1996).
 
 
 155
 Adequate authorization for a truly retroactive effect exists only where there is "statutory language that [is] so clear that it c[an] sustain only one interpretation." Lindh v. Murphy, 521 U.S. 320, ---- n. 4, 117 S.Ct. 2059, 2064 n. 4, 138 L.Ed.2d 481 (1997). As an initial matter, then, we find it plain that this type of clear statutory directive is absent from the PLRA's attorney-fee provision. See Jensen, 94 F.3d at 1192. But see Alexander S. v. Boyd, 113 F.3d 1373, 1385-86 (4th Cir.1997). Section 803(d) simply provides that in any action brought by a prisoner in which attorney fees are authorized under 42 U.S.C. § 1988, such fees "shall not be awarded," except as provided therein. Given the high stakes of the retroactivity question, it would be surprising for Congress to express such an intent by merely stating when attorney fees "shall not be awarded"; we would instead expect some explicit reference that the statute was to apply in the generally disfavored retroactive way.
 
 
 156
 We therefore turn to whether application of section 803(d) to an award of attorney fees for legal assistance completed prior to enactment of the PLRA results in an impermissible retroactive effect. Retroactive effect means more than that the statute is applied to pre-enactment conduct, or that it "upsets expectations based in prior law." Landgraf, 511 U.S. at 269, 114 S.Ct. at 1499 (footnote omitted). Rather, we must inquire whether the new statute " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.' " Id. (citation omitted). In other words, we must ultimately ascertain "whether the new provision attaches new legal consequences to events completed before its enactment." Id. at 270, 114 S.Ct. at 1499.
 
 
 157
 Although " 'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place,' " id. at 265, 114 S.Ct. at 1497 (quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855, 110 S.Ct. 1570, 1586-87, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)), in certain circumstances a court will instead "apply the law in effect at the time it renders its decision," Bradley v. School Bd. of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The defendants argue that the latter principle should apply here, and that the presumption against retroactivity is no bar to the determination of attorney fees because such determinations are collateral to the underlying cause of action. We disagree.
 
 
 158
 Bradley presented almost the converse of the situation here. There, the district court had awarded attorney fees to parents who had prevailed in a school desegregation case, relying on general equitable principles to do so. While the appeal from that decision was pending, Congress passed a statute allowing for an award of attorney fees in school desegregation cases. The Supreme Court held that this statute applied to the pending case, reasoning that to do so did not "result in manifest injustice." Id.
 
 
 159
 The reasoning and result in Bradley, however, do not dictate that the PLRA be applied here, given the key distinction between the cases. There was no manifest injustice in applying the new fee statute in Bradley, given that fees had already been awarded under an alternative theory; the legal theory for an award may have changed, but the fact of the award did not itself present any surprise to the defendants. Here, in contrast, application of the attorney-fee provisions to a fee motion that was pending at the time of the PLRA's passage and that pertained solely to work performed before the statute's passage would undeniably work an impermissible retroactive effect. Throughout 1995, the inmates' attorneys presumably expected that, as the court had ordered, they would be reimbursed for their monitoring work under 42 U.S.C. § 1988 at the then-established rate. Application of the PLRA in determining the attorney fees would frustrate those expectations. Further, the parameters of the attorney-fee statute in effect at the time legal services are requested clearly affects the relationship between the prisoners and their attorneys, including whether an attorney chooses to provide legal assistance in the first place. But see Alexander, 113 F.3d at 1387 n. 12.
 
 
 160
 Indeed, application of the PLRA's attorney-fee provisions where the prisoners' attorneys have reasonably conformed their conduct in reliance on the older provisions of 42 U.S.C. § 1988 would confound the very policy underlying the presumption against retroactivity: "In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." Landgraf, 511 U.S. at 265-66, 114 S.Ct. at 1497. Accordingly, we hold that allowing the PLRA's limitations on attorney fees to alter the standards and rate for awarding fees for legal work completed prior to passage of the PLRA results in an impermissible retroactive effect by attaching significant new legal burdens to the completed work, and by impairing rights acquired under preexisting law. See Cooper v. Casey, 97 F.3d 914, 921 (7th Cir.1996). A contrary conclusion would be repugnant to "familiar considerations of fair notice, reasonable reliance, and settled expectations." Landgraf, 511 U.S. at 270, 114 S.Ct. at 1499.
 
 
 161
 As an aside, we note that in dicta, the Court in Landgraf stated that attorney-fee determinations are " 'collateral to the main cause of action' and 'uniquely separable from the cause of action to be proved at trial.' " Id. at 277, 114 S.Ct. at 1503 (quoting White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 451-52, 102 S.Ct. 1162, 1166-67, 71 L.Ed.2d 325 (1982)). The labeling of attorney fees as "collateral," however, does not suggest that the presumption against retroactivity should not apply to new attorney-fee provisions. In classifying attorney-fee determinations as "collateral," the Court linked them to their sister class of cases--those involving new procedural rules. See id. at 275-77, 114 S.Ct. at 1502-03. Generally, courts may apply new procedural rules to cases arising before their enactment without triggering concerns about retroactivity because "rules of procedure regulate secondary rather than primary conduct." Id. at 275, 114 S.Ct. at 1502. The Court nevertheless recognized that "the mere fact that a new rule is procedural does not mean that it applies to every pending case." Id. at 275 n. 29, 114 S.Ct. at 1502 n. 29 (emphasis added). Rather, "the applicability of such provisions ordinarily depends on the posture of the particular case." Id. In other words, laws regulating litigation conduct often impact the substantive rights of the parties as well. Cf. Hughes Aircraft Co. v. United States, 520 U.S. 939, ----, 117 S.Ct. 1871, 1878, 138 L.Ed.2d 135 (1997). Similarly, a law governing attorney-fee provisions may also affect the substantive rights of the parties--and in this instance, as we have explained, it does.
 
 
 162
 We note, finally, that our holding does not address the effect of the PLRA's fee-limitation provisions on attorney fees for post-PLRA-enactment work rendered in a case that was pending at the time of enactment. See Landgraf, 511 U.S. at 289, 114 S.Ct. at 1523-24 (Scalia, J., concurring). The issue whether fees earned by the plaintiffs' attorneys after April 26, 1996, will be limited by the PLRA is not before us in this appeal, and we have no occasion to address it.
 
 2.
 
 163
 The defendants' second argument takes issue with particular aspects of the plaintiffs' attorney fees. "A district court's award or denial of attorney's fees is reviewed for abuse of discretion." Cramblit v. Fikse, 33 F.3d 633, 634 (6th Cir.1994) (per curiam ). "This deference[ ] 'is appropriate in view of the district court's superior understanding of the litigation[.]' " Scales v. J.C. Bradford & Co., 925 F.2d 901, 909 (6th Cir.1991) (citation omitted).
 
 
 164
 a.
 
 
 165
 The defendants argue that the plaintiffs are not entitled to attorney fees for work done in connection with proceedings collateral to the main action when the plaintiffs did not prevail in those collateral proceedings. Specifically, the district court awarded certain relief in 1995, from which orders the defendants appealed. While the appeals were pending, the district court vacated the orders. Although the defendants initially appealed the order vacating the prior orders, they later filed a stipulation of voluntary dismissal of their appeals. The defendants now argue that the plaintiffs were not the prevailing parties with regard to those appeals, and that the defendants should not, accordingly, be liable for any attorney fees and costs.
 
 
 166
 We have already rejected a virtually identical argument in a previous Glover appeal. There, the defendants had argued that the plaintiffs were not entitled to attorney fees for their work on various contempt motions because they could not be "prevailing parties" with respect to those motions until and unless this court heard the appeal and ruled in the plaintiffs' favor. We said then:
 
 
 167
 Defendants claim the district court erred in awarding attorneys' fees without determining whether plaintiffs were prevailing parties. They contend that plaintiffs are not prevailing parties under 42 U.S.C. § 1988 until this court reviews the district court's finding of contempt because compliance with the court's 1979 and 1981 orders is the sole issue, and plaintiffs cannot establish the degree of success required to be a prevailing party entitled to a fee award until this court decides the contempt issue.
 
 
 168
 ....
 
 
 169
 The district court has the discretion to award the prevailing party in a civil rights action reasonable attorneys' fees. We reject the argument that the filing of a contempt motion to compel compliance with the court's previous orders is something other than monitoring, which is a compensable activity under section 1988....
 
 
 170
 In bringing the contempt motion, plaintiffs were seeking defendants' compliance with the district court's 1979 and 1981 orders in which plaintiffs were prevailing parties. The district court did not abuse its discretion in finding plaintiffs were entitled to attorneys' fees.
 
 
 171
 Glover, 934 F.2d at 715-16 (citations omitted).
 
 
 172
 The defendants rely heavily on our decision in Northcross v. Board of Education, 611 F.2d 624 (6th Cir.1979), claiming that Northcross held that fees may not be awarded for work on collateral matters. The only passage in that case even remotely speaking to this issue is the following:
 
 
 173
 The hearings here involved were collateral to and distinct from the desegregation suit itself, which had been finally terminated in 1974, so had the plaintiffs failed to prevail on the merits the district court would have been justified in denying fees altogether.
 
 
 174
 Id. at 641. Noting that this risk created a "real element of contingency as to whether the attorneys would be compensated for their services at all," id., the Northcross court approved a 10% increase for the fees in question. Obviously, this does not support the defendants' position in the slightest. In the first place, it is dicta. In the second, it does not purport to create a rule that collateral matters cannot be compensated unless plaintiffs prevail on those matters; it simply declares that a court is "justified" in not compensating them under those circumstances.
 
 
 175
 We find the defendants' argument to be without merit. The plaintiffs should be compensated for their work in connection with the appeal of the Compliance Committee matter, both because the defendants' voluntary dismissal of the appeal in effect made the plaintiffs prevailing parties, and because that appeal clearly constituted a "monitoring" matter within the meaning of this court's earlier Glover opinion.
 
 
 176
 b.
 
 
 177
 The defendants next argue that the district court improperly allowed an award for 40 hours of time spent by counsel in discussing the case. They contend that the district court misunderstood their arguments in this respect, and incorrectly characterized it as an argument about 13 hours of time. They argue that discussing the case for some period of time is reasonable, but 40 hours is excessive. The plaintiffs respond that there is no evidence in the record supporting an argument that the plaintiffs' counsel spent 40 hours discussing the case, or that the defendants ever made an objection to 40 hours of discussion. The defendants' letter to the plaintiffs simply refers to a number of fee-entry dates which they contended represented duplicate billings, and does not identify a total number of hours objected to. Moreover, the plaintiffs argue, of the dates identified by the defendants as containing objectionable conferences, two do not contain any reference to consultations, and the remainder add up to 13 hours billed by each attorney for consultations.
 
 
 178
 The defendants again rely almost entirely on Northcross, 611 F.2d 624, suggesting that Northcross stands for the proposition that district courts should deduct for any duplicative hours. Suffice it to say that Northcross does not stand for this proposition. The court in Northcross noted that a court may exercise its discretion to "cut [hours] for duplication, padding or frivolous claims. In complicated cases, involving many lawyers, we have approved the arbitrary but essentially fair approach of simply deducting a small percentage of the total hours to eliminate duplication of services." Id. at 636-37. There is, obviously, an enormous difference between approving such a course of action in a particular case and establishing a rule that such a course is required. There is, moreover, nothing in Northcross that suggests that the mere fact of attorneys conferring with each other automatically constitutes duplication.
 
 
 179
 We note, too, that as with the defendants' previous argument, we have already rejected the same type of double-billing/consultation argument that the defendants raise now, finding no abuse of discretion in the district court's compensation of plaintiffs' counsel for consultation that was " 'reasonably proportionate to their total hours.' " See Glover, 934 F.2d at 717 (citation omitted). We note further that we have consistently held a party complaining about attorney fees to a burden of stating their complaints with particularity:
 
 
 180
 Ideally, a party should raise objections with specificity, pointing out particular items, rather than making generalized objections to the reasonableness of the bill as a whole. The defendants' failure to raise more than a generalized objection to the fees in this case would ordinarily require us to review only those items which should have been eliminated through a cursory examination of the bill. Since we are remanding the case for reconsideration of the fee award, we see no reason why the defendants should not be permitted to raise further specific objections.
 
 
 181
 Wooldridge v. Marlene Indus. Corp., 898 F.2d 1169, 1176 n. 14 (6th Cir.1990) (citation omitted).
 
 
 182
 In sum, we reject the defendants' complaint with respect to the alleged duplication of effort. The defendants have failed to provide even minimal support for their allegations, and we are simply left with no basis for concluding that the district court abused its discretion in finding that amount of consultation reasonable, especially given that we earlier approved the district court's actions in the face of a virtually identical complaint by the defendants.
 
 
 183
 c.
 
 
 184
 The defendants' final argument is that the district court should not have allowed an award for time spent by plaintiffs' counsel on activities such as intervening on behalf of inmates who received misconduct tickets for rule violations, or complaining about whether the inmates had ice or heat at particular times. These activities, defendants contend, are completely outside the ambit of this case. While the plaintiffs claim that these incidents all constituted "retaliation" by the defendants against inmates involved in this case, and thus give rise to legitimate post-judgment monitoring, the defendants point out that there has never been a finding of retaliation against any female inmate in connection with this case.
 
 
 185
 With respect to this argument, we will reverse and remand. While it is possible that the plaintiffs' attorneys' efforts constituted legitimate monitoring, we find it disturbing that there is nothing in the record to evidence their claims that the defendants' actions were retaliatory in nature. Before the district court approves such fees, there must be an explicit finding that the fees were related to the underlying case.
 
 V.
 SUMMARY AND CONCLUSION
 
 186
 We intend by the rulings we make today to materially assist in bringing to a close the federal court's supervision of the Michigan women's prison system. We do so, in the last analysis, by redirecting the attention of all concerned to the issues that divided the parties when the case was filed nearly 20 years ago. The district court has struggled mightily and with an admirable show of patience in an effort to bring about educational and vocational parity of opportunity and the level of access to the courts it thinks are required by the United States Constitution. It has not succeeded.
 
 
 187
 The parties, as between themselves, and the defendants, vis--vis the district court, are light-years apart in their conceptions of what the Fourteenth Amendment Equal Protection Clause requires concerning parity in educational and vocational opportunities for men and women inmates. And we are not particularly surprised. Not a single federal appellate court in the nation has ever held that a lack of parity with respect to educational or vocational opportunities between male and female inmates is a violation of the Equal Protection Clause of the Fourteenth Amendment--not before this case was filed in 1979 or ever since. Indeed, the Eighth Circuit has flatly rejected the constitutional validity of such an exercise:
 
 
 188
 [T]he programs at [the Nebraska State Penitentiary, a male prison,] and [the Nebraska Center for Women, a female prison,] reflect separate sets of decisions based on entirely different circumstances. When determining programming at an individual prison under the restrictions of a limited budget, prison officials must make hard choices. They must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution, to determine the optimal mix of programs and services. Program priorities thus differ from prison to prison, depending on innumerable variables that officials must take into account. In short, NSP and NCW are different institutions with different inmates each operating with limited resources to fulfill different specific needs. Thus, whether NCW lacks one program that NSP has proves almost nothing.
 
 
 189
 Indeed, as between any two prisons, there will always be stark differences in programming. Assuming that all prisons start with adequate yet limited funding--as we must here, because the plaintiffs do not claim that NCW is subject to discriminatory funding--officials will calibrate programming differently in each prison, emphasizing in one prison programs that they de-emphasize in others. Thus, female inmates can always point out certain ways in which male prisons are "better" than theirs, just as male inmates can always point out other ways in which female prisons are "better" than theirs. Comparing an isolated number of selected programs at NSP and NCW is thus a futile exercise. At bottom, using an inter-prison program comparison to analyze equal protection claims improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly.
 
 
 190
 Klinger v. Department of Corrections, 31 F.3d 727, 732 (8th Cir.1994) (citations and footnote omitted); accord Women Prisoners v. District of Columbia, 93 F.3d 910, 924-27 (D.C.Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997). See generally Keevan v. Smith, 100 F.3d 644 (8th Cir.1996).
 
 
 191
 Thus, the district court here has for many years sought to remedy a constitutional violation of dubious validity, but we do not and, indeed, may not question the district court's underlying judgment because the defendants never appealed it. Therefore, we have been left with the duty to review only the district court's many remedial orders and judgments, most of which determine whether its previous orders and judgments designed to achieve parity have been obeyed. Similarly, the district court's 1979 judgment that the female inmates have been denied constitutionally required access to court was never appealed and our subsequent appellate activity with respect to that issue has likewise been limited for the most part to reviewing the propriety of the ever-expanding detail of the district court's compliance orders.
 
 
 192
 Now it is time to return to the issue that was litigated and adjudicated in 1979 and to determine whether, now, there exists a denial of equal protection of the law in the provision of educational and vocational opportunities for female inmates, and whether, now, female inmates are being denied the level of access to court that is required under the First Amendment. We hasten to observe that although our holding today does not call into question the district court's 1979 judgment, it does require that a judgment be made as to the conditions as they exist now--not as measured by the many implementing orders and suggested remedial plans that have been in this case since 1981, but as measured by the Equal Protection Clause of the Fourteenth Amendment and the access-to-court requirements of the First Amendment as authoritatively interpreted.
 
 
 193
 As to the first of the appeals consolidated here for review, 95-1521, we hold that the district court's judgment denying the defendants' motion to terminate continuing district court jurisdiction is VACATED and the matter is REMANDED for further proceedings consistent with this opinion. We shall retain jurisdiction with respect to this appeal only.
 
 
 194
 The district court's judgment in appeal number 96-1931, finding the defendants in contempt of court and imposing sanctions, is AFFIRMED in part and REVERSED in part, and this matter is REMANDED for further proceedings.
 
 
 195
 Finally, the district court's judgment awarding attorney fees, under consideration in appeal numbers 96-1852 and 96-1948, is AFFIRMED in part and REVERSED in part, and the matter is REMANDED for further proceedings.
 
 
 196
 WELLFORD, Circuit Judge, concurring in part and dissenting in part.
 
 
 197
 Judge Ryan has done a commendable job in examining and dealing with the extended and complex issues involved in this case. I write separately to address those issues of particular concern to this judge who, like many of my colleagues, has been called upon to address a number of appeals dealing with what I characterize as micromanagement of the Michigan prisons and penal system by the experienced district judge involved in this appeal and other Michigan district judges. This case alone has generated numerous appeals, very substantial legal expense, and has occasioned a recent appeal to, and decision by, another panel on other aspects of this bundle of controversies, styled Mary Glover, et al. v. The Director of Prisons, et al.[1] This case and Hadix have been litigated for more than twenty years, and the United States v. Michigan, 134 F.3d 745 (6th Cir.1998) case for nearly fifteen years. Enormous state resources and administrative efforts have been expended to deal with these lawsuits and injunctive actions.
 
 I. ATTORNEY FEES
 
 198
 A. Effect of Prison Litigation Reform Act ("PLRA," 42 U.S.C. § 1997e(d) et seq.)
 
 
 199
 Appellate cases Nos. 96-2586/2588/97-1218/1272 involved plaintiffs' fee claims and the effect of PLRA on these claims. Hadix v. Johnson, Nos. 96-1851/1943/1908/1907, also involved, in part, plaintiffs' attorney's fee claims. We have held that the § 1997e(d) cap on fees does not apply to legal work otherwise covered performed prior to the enactment of PLRA.
 
 
 200
 I feel strongly, however, that the Fourth Circuit was correct in Alexander v. Boyd, 113 F.3d 1373 (4th Cir.1997), that the Act and its cap on fees applies to work completed before enactment of the PLRA but awarded after such enactment. I find the statutory language in that respect unambiguous--fees "shall not be awarded" except as the statutes provides. "[A]pplication of an attorney fees provision to ongoing litigation is arguably not retroactive." Landgraf v. USI Film Products, 511 U.S. 244, 289, 114 S.Ct. 1522, 1523-24, 128 L.Ed.2d 229 (1994) (Scalia, J., concurring). I would count attorney fee applications as collateral to the underlying merits and procedural in nature. See Landgraf, 511 U.S. at 275-77, 114 S.Ct. at 1502-03. Being procedural, a change in fee rate may be effectuated retroactively by PLRA, and certainly if the work is merely of a paralegal-type function.
 
 
 201
 The PLRA is even more clear that its fee limitation provisions apply to work rendered on a pending case after its enactment. There is, in such a situation, no reasonable argument on the part of plaintiffs' counsel that under the plain language of the limitation, after it became law, that counsel could expect to continue to be compensated at a rate higher than the statute allows. A contrary holding means that the statutory limitation is to be ignored for legal work performed after its enactment (and clear expression of congressional intent) in a pending case such as this where "the end does not appear in sight." I find nothing in the statute's legislative history that suggests it is not to apply to pending cases, at least as to legal work performed after its enactment.
 
 
 202
 I would require, moreover, that as to each substantial issue in dispute for plaintiffs to establish entitlement to what should be a statutorily limited fee, they must show that they are a prevailing party and have entitlement on that issue. Otherwise, plaintiffs are court encouraged in this case to pursue new and even expanding areas of claims against the state, such as furnishing a counsel at state expense to female prisoners (not male prisoners) in civil custody and domestic relations cases in state courts. See our recent decision Glover v. Johnson, 75 F.3d 264 (6th Cir.1996).[2]
 
 
 203
 I must therefore DISSENT on the attorney's fee issue as to construction of PLRA and its limitations.
 
 B. Other Attorney's Fee Holdings
 
 204
 What has been said in section A above I would reiterate as to what I consider collateral attorney's fee claims, particularly on matters such as we addressed in Glover v. Johnson, 75 F.3d 264 (6th Cir.1996). It is a time in this litigation (as well as in Hadix ) to take seriously the congressional concerns with ever-expanding federal court involvement in prisoner litigation as reflected in the PLRA. Congress clearly intended to restrict and limit such litigation, and federal court involvement at state expense and to put a cap on attorney's fees to be awarded prisoner representatives.
 
 
 205
 I would call upon the district courts to examine very carefully so-called monitoring fees of counsel and persons designated by the courts to serve as a kind of prison overseer on ombudsmen. Potential for excessive claims and charges to the state treasury is plainly implicated. I concur in the majority decision that vacates fee awards for "advocacy by plaintiffs' attorneys on behalf of inmates who were allegedly retaliated against by the defendants."
 
 
 206
 I would also disallow one-half of the thirteen plus hours' time charge claimed by plaintiffs' attorneys in "consulting, conferring and discussing matters" together as representing duplication of effort or double charging.
 
 II. VOCATIONAL PROGRAMMING
 
 207
 I would also DISSENT from the affirmance of a contempt finding for offering and maintenance of four vocational programs instead of six ordered by the district court. There was inadequate proof, in my opinion, that defendants willfully and contumaciously acted to deprive female prisoners of reasonable vocational opportunities commensurate with the greater number of programs offered to the far greater number of male prisoners in a much higher number of male prison facilities. Taking into account geographic differences in locations, demonstrated interest, work experience, and financial burdens involved in maintaining a small program for women prisoners, I would conclude that there was no reasonable basis for a contempt finding on this issue.
 
 
 208
 I add but one more observation about what relief may be mandated in this extended controversy and the other related prison cases in Michigan. Prisoners are entitled to relief only when they show constitutional violations by prison authorities. It seems to me that "entitlements" to desirable educational, vocational, and administrative benefits have been the norm in Michigan prison cases rather than constitutional mandates. This case is not about denial of access, education, and vocational opportunity to female prisoners, but rather about the extent of such opportunities in relation to those which may have been offered to men in some Michigan male penal institutions.
 
 
 209
 I have expressed relatively narrow disagreement, except as to applicability of PLRA and fees, in the extensive majority opinion. In general, I have concurred because it covers the real issues with discernment.
 
 
 
 [1]
 Apart from numerous appeals in Glover, there have also been a number of appeals in Hadix v. Johnson, another Michigan prisoner class action, in which an appeal is pending, (Nos.96-1851/1907/1908/1943). In addition, still another panel has recently decided an appeal in United States v. State of Michigan, 134 F.3d 745, dealing with a consent decree and compliance plan regarding prison conditions in Michigan. Still other prisoner retaliation claims have recently come before us on appeal based on a cursory examination of our docket: Thaddeus-X v. Blatter, 110 F.3d 1247 (6th Cir.1997) (now under en banc consideration), and White v. McGinnis, 131 F.3d 593 (6th Cir.1997). See also the recent class action Michigan prisoner visitation case, Bazzetta v. McGinnis, 133 F.3d 382 (6th Cir.1998). See also Hadix v. Johnson, 133 F.3d 940 (6th Cir.1998) (PLRA is constitutional)
 
 
 [2]
 It is interesting to note that the district court apparently ignored our decision in that case in an order dated January 31, 1997, on the purported authority of MLB v. SLJ, 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). MLB v. SLJ mandates a pauper parent in a civil appeal an appellate record at state expense. It does not deal with requiring a state to furnish female prisoners counsel in civil cases having to do with domestic relations or child custody. Plaintiffs, no doubt, will be seeking attorney's fees at a rate exceeding the PLRA for such legal services expressly held not to be mandated by our court