Darnell COOPER and Anthony
Davis, Plaintiffs–Appellees,

v.

Michael CASEY, et al., Defendants–
Appellants.

Nos. 95–2324, 95–3529.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1996.

Decided Oct. 2, 1996.

Steven D. McCormick, Roger L. Taylor, Barry E. Fields (argued), Sarah R. Marmor, Kirkland & Ellis, Chicago, IL, for Darnell Cooper in Nos. 95–2324, 95–3529.

Steven D. McCormick, Roger L. Taylor, Barry E. Fields (argued), Sarah R. Marmor, Kirkland & Ellis, Chicago, IL, for Anthony Davis in No. 95–2324.

Mary E. Welsh (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Michael Casey, Kevin Laskey, Charles Banks, Rodney Stewart, James Cervenka, Clyde E. Nash, Keith Langston, Rodney D. Johnson in No. 95–2324.

Roger L. Taylor, Barry E. Fields (argued), Sarah R. Marmor, Kirkland & Ellis, Chicago, IL, for Anthony Davis in No. 95–3529.

Mary E. Welsh (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Michael Casey, Kevin Laskey, Rodney Stewart, James Cervenka, Clyde E. Nash, Keith Langston, Rodney D. Johnson in No. 95–3529.

Before POSNER, Chief Judge, and ESCHBACH and ROVNER, Circuit Judges.

POSNER, Chief Judge.

Two cellmates in the disciplinary wing of Illinois' Stateville prison brought suit under 42 U.S.C. § 1983 against several guards at the prison, claiming that the guards had

beaten them and then refused to give them medical assistance. A five-day jury trial resulted in a judgment for each of the plaintiffs of $5,000 in compensatory damages and $60,000 in punitive damages, for a total of $130,000 for both plaintiffs. The judge then awarded the plaintiffs $163,000 in attorneys' fees and $12,000 in costs. 897 F.Supp. 1136 (N.D.Ill.1995). The state appeals from both the underlying judgment and the award of attorneys' fees.

The plaintiffs testified that as they were being led back to their cells in handcuffs after a stint in the prison's recreational yard, they spotted a friend named Bujack and shouted greetings to him that he answered in kind. One of the defendants, Captain Clyde Nash, came out of his office and told the plaintiffs to "hold the damn noise down." Another defendant—a guard who was escorting the plaintiffs—told them they had "fronted him off in front of the Big C," a reference to Captain Nash (either "Big Clyde" or "Big Crusher"). Prisoners and guards began bickering. When they reached the cell, one of the defendants shoved one of the plaintiffs in the back, provoking the angry response, "Don't be putting your damn hands on me while I am cuffed." The officer threatened to remove the plaintiff's handcuffs and whip or kick his ass. The plaintiff's reply was that such an act would make the officer "bogus" (that is, a wrongdoer). The officers then removed the plaintiffs' handcuffs and, joined by other guards who are also defendants, kicked and beat and maced the plaintiffs, inflicting cuts, severe muscular pain, and (as a consequence of the mace) a burning sensation in their eyes and skin. After the beatings the plaintiffs shouted for medical assistance, to which one officer replied, "Fuck y'all." Despite their repeated pleas the plaintiffs received no medical assistance until the second day after the beating, when they were finally seen by a prison doctor, who ordered x-rays. The x-rays were negative but the doctor prescribed a mild dosage of Robaxin, a prescription drug for the relief of muscular pain.

The defendants' evidence consisted principally of their own testimony and that of prison medical personnel. They testified that the verbal altercation sparked by the shouted greetings to Bujack escalated into a general melee when another inmate shouted "Rodney King!" (The police officers who had been prosecuted for using excessive force in arresting Rodney King had just been acquitted, provoking a race riot in Los Angeles.) The plaintiffs had struck the first blows and no greater force had been used than was necessary to handcuff them—they had managed somehow to remove their handcuffs before the melee began. The prison doctor testified that there was no evidence of significant injury to the plaintiffs save their subjective claims of pain.

The jury didn't have to believe the defendants, who on this appeal make no serious effort to show that there was insufficient evidence of excessive force to support the jury's verdict but do challenge vigorously the finding of deliberate indifference to the plaintiffs' need for medical attention. They argue both that the injuries were too slight to create a constitutional entitlement to medical treatment and that there is no evidence that the defendants knew the plaintiffs had been injured. In support of the first argument they point to the sparsity of evidence that the plaintiffs sustained any injuries, let alone serious ones, and in support of the second argument they point to the plaintiffs' inability to identify which of the defendants knew what and when.

Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment, e.g., *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. E.g, *Davis v. Jones,* 936 F.2d 971, 972 (7th Cir.1991). A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution. The Constitution is not a charter of protection for hypochondriacs. But the fact that a condition

does not produce "objective" symptoms does not entitle the medical staff to ignore it. A similar point is familiar from social security disability cases. Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, as the social security disability law does not, *Sarchet v. Chater*, 78 F.3d 305 (7th Cir.1996); *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995); *Fair v. Bowen*, 885 F.2d 597, 601–03 (9th Cir.1989), that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law.

■ The issue here is not disability. It is whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating. That was an issue for the jury. See *Murphy v. Walker*, 51 F.3d 714, 719 (7th Cir.1995) (per curiam). To require a threshold showing of an "objective" injury, the sort of thing that might reveal itself on an x-ray, or in missing teeth, or in a bruised and battered physical appearance, would confer immunity from claims of deliberate indifference on sadistic guards, since it is possible to inflict substantial and prolonged pain without leaving any "objective" traces on the body of the victim. *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir.1988); *Hudson v. McMillian*, 503 U.S. 1, 13–14, 112 S.Ct. 995, 1002–03, 117 L.Ed.2d 156 (1992) (concurring opinion). So the plaintiffs were not required to call a medical expert as a witness; and the defendants' medical witness helped the plaintiffs' case as much as he helped the defendants'. He acknowledged on cross-examination that he would not have ordered x-rays had he not had some reason to believe that the plaintiffs might be injured. And notwithstanding the negative result of the x-rays he prescribed a prescription painkiller, even though for minor pain nonprescription painkillers are adequate. It would be a different case if, as in *Goffman v. Gross*, 59 F.3d 668 (7th Cir.1995), the existence or gravity of the particular medical harm were outside a layperson's, and hence the jury's, understanding. That was a case about the effects on human health of ambient smoke; this is a case about pain—

which students of philosophy will recognize as the textbook example of a uniquely subjective experience.

■ As to whether the defendants *knew* that the plaintiffs needed pain medication—a prerequisite to liability for *deliberate* indifference to a prisoner's medical needs, *Farmer v. Brennan*, 511 U.S. 825, —— – ——, 114 S.Ct. 1970, 1979–80, 128 L.Ed.2d 811 (1994); *Billman v. Indiana Dept. of Corrections*, 56 F.3d 785, 788 (7th Cir.1995)—we do not think that the fact that the plaintiffs directed their request to the world at large, as it were, by screaming from their cells, rather than directing the request to a specific guard, entitled the defendants to judgment as a matter of law. The defendants were all stationed in the plaintiffs' wing of the prison. It was a permissible though not inevitable inference that all of them would have heard the plaintiffs' cries during the period of almost 48 hours before medical assistance was offered, especially since all had participated in the beating of the plaintiffs and would therefore have had no basis for believing them simply noisy malingerers. When guards use excessive force on prisoners, the requirements for proving deliberate indifference to the medical needs of the beaten prisoners ought to be relaxed somewhat. Beating a person in violation of the Constitution should impose on the assailant a duty of prompt attention to any medical need to which the beating might give rise, by analogy to the duty in ordinary tort law to provide assistance to a person whom one has injured, even if without fault. E.g., *Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486, 491 (1st Cir.1991); *Restatement (Second) of Torts* § 322 (1965). And here it was not without fault.

■ The defendants complain about the district judge's evidentiary rulings, in particular his refusal to allow testimony that the plaintiffs were incarcerated in the prison's disciplinary-segregation unit at the time of the incident that gave rise to the suit. They cite *West v. Love*, 776 F.2d 170, 174 (7th Cir.1985), for the proposition that such testimony would bear on the guards' expectation of danger should inmates "mouth off" at them, as happened here. In *West*, however,

there was evidence that disciplinary confinement was for violent offenders. Here the evidence is that it is punitive; if you violate a prison rule, you're punished by being confined more closely than the general prison population. The jury was apprised that Stateville is a maximum security prison; this implies that all or most of its inmates are dangerous. In the absence of any offer of proof concerning the incremental dangerousness of the prisoners in the disciplinary wing, the district judge, concerned lest identifying the plaintiffs as discipline problems poison the jury against them, did not abuse his discretion in deciding to keep this evidence out.

We do not want to exaggerate the difference between this case and *West*, which was also a case out of Stateville. Common sense, moreover, tells us that the prisoners in the disciplinary unit of a maximum security prison are apt to be the worst of the worst and that guards must therefore use more repressive methods in dealing with them. But all *West* holds is that the trial judge had not abused his discretion in letting the evidence in, 776 F.2d at 174; a decision to keep it out might have been upheld as well. Maybe the district judge should have let in the evidence in this case as well, but we do not think that his decision to exclude it can be deemed an abuse of discretion, warranting reversal. Fed.R.Evid. 403; *Rascon v. Hardiman*, 803 F.2d 269, 278 (7th Cir.1986); *Needham v. White Laboratories, Inc.*, 847 F.2d 355, 360 (7th Cir.1988).

█ The defendants next complain that the judge refused to let them testify to heightened racial tension in the prison following the Rodney King verdict. The judge wanted so far as possible to keep issues of race out of the case. Whether or not he was right to do so we do not see how the defendants could have been prejudiced. The heightened racial tension might explain the verbal altercation between the plaintiffs and the defendants that preceded the assaults; it would not make it more likely that the plaintiffs rather than the defendants threw the first punch. Racial tension cuts both ways. It engenders violence by whites against blacks as well as by blacks against whites.

The defendants have other complaints about the district judge's conduct of the trial, but the only one that merits discussion is that the judge gave the jury an impression that he was biased in favor of the plaintiffs. He shook his head, apparently signifying disbelief, during the testimony of one of the defendants; and in addition, in the words of the defendants' counsel, he "harshly critiqued defense counsel's actions before the jury with pointed, often gratuitous remarks on many occasions" and he "sarcastically chastized [sic] defense witnesses when sustaining objections." Sometimes he sustained objections by the plaintiffs' lawyer on grounds different from those offered by the lawyer and sometimes he cut off defense witnesses without waiting for an objection. He asked some hostile questions of defense witnesses and most though not all of his evidentiary rulings favored the plaintiffs.

Although judgments have been reversed because the presiding judge abused counsel for one of the parties or otherwise took sides during a jury trial, e.g., *United States v. Dellinger*, 472 F.2d 340, 386, 391 (7th Cir. 1972), such cases are rare. This case shows why. Many of the signs of bias to which the defendants point are no such thing. That a judge rules more often for one side than for the other may show nothing more than that one side has the better case or the abler lawyer. More of the objections made by defense counsel were groundless, so naturally the balance of rulings favored the plaintiffs. It appears that whether because of lack of experience or otherwise the defendants' principal lawyer was badly outclassed. The problem of inadequate representation of the State of Illinois and its agencies and employees is an old one to which we have frequently drawn attention though as yet without effect. *Holland v. McGinnis*, 963 F.2d 1044, 1057–58 (7th Cir.1992); *Smith v. Rowe*, 761 F.2d 360, 365–66 (7th Cir.1985); *Joseph v. Brierton*, 739 F.2d 1244, 1247–48 (7th Cir.1984); *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1126 (7th Cir.1979); *United States ex rel. Mattox v. Scott*, 507 F.2d 919, 924 (7th Cir.1974) (per curiam). Defense counsel in this case engaged in interminable and inept

cross-examination, which consisted mainly of getting the plaintiffs to repeat their testimony a second time, unwittingly reinforcing the plaintiffs' case. Illustrative questions were, "After Officer Casey struck you in the face with his fist, what, if anything, else did Officer Casey do?" and "When Officer Johnson had you on the headlock, were you crunched up in a ball or were you laying flat on the floor?" Counsel also confused everybody by the sequence in which she called her witnesses. The initial witnesses testified about matters concerning the physical layout of the disciplinary unit. The relevance of this testimony was impossible to determine before the defendants themselves testified, and much of it had to be stricken because counsel was not able to reassure the court that the defendants' testimony would establish that it was relevant. In addition, both defense counsel and defense witnesses repeatedly violated the ground rules that the judge had set for the trial, including the exclusion of evidence that the plaintiffs had been confined in a disciplinary unit. Repeatedly defense counsel would "accidentally" refer to the fact that the plaintiffs were in disciplinary segregation. At one point, when a juror told the judge that he could hear a defense witness discussing with one of the defendants evidence that the judge had excluded from the case, the judge was moved to remark (fortunately out of the hearing of the jury), "This is like a zoo."

■ Federal district judges are busy people and they get irritated when lawyers waste their time and that of jurors, witnesses, and the other lawyers. It is unfortunate, but it is inherent in an adversary system, that the cost of this irritation is likely to be borne primarily by the client. The defendants may have been harmed by the judge's headshaking and sarcasms but if so the ultimate cause was their own lawyer. Reversible error occurs in these circumstances only when the judge so impairs the lawyer's credibility in the eyes of the jury as to deprive the client of a fair trial. *United States v. Blakey,* 607 F.2d 779, 788 (7th Cir.1979). That point was not reached here. *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994); *Wallace v. Mulholland,* 957 F.2d 333, 337 (7th Cir.1992);

*Mraovic v. Elgin, Joliet & Eastern Ry.,* 897 F.2d 268, 272 (7th Cir.1990); *United States v. Tuchow,* 768 F.2d 855, 873–74 (7th Cir.1985); *United States v. Devin,* 918 F.2d 280, 294–95 (1st Cir.1990); cf. *Rosen v. Sugarman,* 357 F.2d 794, 798–99 (2d Cir.1966) (Friendly, J.).

■ The defendants make a number of complaints about the award of damages. One that signally lacks merit is that the judge should have asked the jurors to apportion the compensatory damages among the defendants. This was impossible because the kicking and punching and macing and refusal to provide prompt medical assistance coalesced to produce a quantity of pain in which the contributions of the individual defendants could not be distinguished. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 52, pp. 345–46 (5th ed.1984). The defendants also argue that if they did violate the constitutional rights of the plaintiffs the violations were too close to the line that separates the lawful from the unlawful to warrant an award of punitive damages. But if the plaintiffs' testimony was believed the defendants made a wanton and cowardly attack and then deliberately refused medical assistance for the pain caused by the attack. We cannot think of a better case for an award of punitive damages.

■ The defendants complain that the award of punitive damages was excessive because it was twelve times the award of compensatory damages. While the limits that courts place on the size of awards of punitive damages probably should be more definite and predictable than under current law, a mechanical ratio, such as two to one or three to one or four to one or even ten to one, would not make good sense. *BMW of North America v. Gore,* — U.S. —, — —, 116 S.Ct. 1589, 1601–02, 134 L.Ed.2d 809 (1996). The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages, which we canvassed in *Kemezy v. Peters,* 79 F.3d 33, 34–35 (7th Cir.1996); see also *BMW of North America v. Gore, supra,*

—— U.S. at ——, 116 S.Ct. at 1605 (concurring opinion). The compensatory damages were low here in part because of the inherent difficulties of fixing a dollar equivalent for subjective injuries, such as fright and pain. An award of punitive damages proportioned to the low compensatory damages that were awarded would have a very meager deterrent effect, would fail to signal to the prison authorities that savage treatment of prisoners will not be tolerated, and would not be commensurate with the moral gravity of the defendants' actions.

The highest award of punitive damages against any one of the seven defendants was only $22,500. The sky is not the limit, but $22,500 is not the sky. Neither the size of the awards nor their ratio to the compensatory damages awarded is out of line with comparable previous cases. See, e.g., *Bogan v. Stroud*, 958 F.2d 180, 186 (7th Cir.1992); *Hagge v. Bauer*, 827 F.2d 101, 110 (7th Cir. 1987); *Jackson v. Crews*, 873 F.2d 1105, 1109 (8th Cir.1989).

We come last to the award of attorneys' fees. 42 U.S.C. § 1988(b). The defendants object to both the number of hours and the rates per hour. The first objection is unsubstantiated and picayune, and we reject it. The second is more substantial. The plaintiffs were represented by Kirkland & Ellis. A partner and two associates accounted for the bulk of the time that the firm put in on the case. They requested reimbursement at the rates at which they bill the paying clients of their firm, ranging from $120 to $320 an hour. The district judge allowed these rates on the ground that they were in fact the rates at which these lawyers bill their paying clients and therefore represented the opportunity costs of (that is, the earnings forgone by) their taking on the representation of the plaintiffs.

The cases properly emphasize opportunity cost in the determination of a reasonable attorney's fee. If the plaintiffs' lead lawyer, in order to work on this case, gave up work for a client who would have paid him $320 an hour for each of the hours that he spent on this case, that is presumptively a reasonable fee for his services in this case. *People Who Care v. Rockford Bd. of Education*, 90 F.3d 1307, 1310 (7th Cir.1996); *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150–51 (7th Cir.1993). But the plaintiffs and the district court overlooked an important qualification: the reasonable fee is capped at the prevailing market rate *for lawyers engaged in the type of litigation in which the fee is being sought.* *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 519 (7th Cir.1993); *Buffington v. Baltimore County*, 913 F.2d 113, 130 (4th Cir.1990). Suppose the best lawyer in the United States charges $1,000 an hour and is worth every cent of it. Only his practice has nothing to do with civil rights; he is, let us say, an antitrust trial lawyer. He is requested to represent an indigent civil rights plaintiff, and he does so, giving the case his best shot and, despite his inexperience in civil rights litigation, doing a superb job. Would he be entitled to an award of fees at the rate of $1,000 an hour? Not if the judge could have procured competent counsel for the plaintiff at a much lower rate. It is no more reasonable to pay a lawyer $1,000 an hour for services that can be obtained at $200 an hour than it is to pay $1,000 for an automobile hood ornament that you could buy elsewhere for $200. Judges have to be careful when they are spending other people's money.

Two qualifications should be noted. If in our example the lawyer gets $1,000 an hour because he is five times as fast as the lawyer who charges $200 an hour, there would be no objection to his higher hourly fee; the bottom line would be the same. Or if his antitrust trial skills were perfectly transferable to civil rights litigation and as a result he was able to obtain a much better outcome for his civil rights client than the civil rights specialist could have done, he would be entitled to his high fee. Neither has yet been shown in this case. There is no evidence that the plaintiffs' lawyers practice in the area of civil rights, are seeking a smaller total award than civil rights lawyers charging lower hourly rates would obtain, or achieved substantially better results than civil rights lawyers would have achieved. The only evidence so far is evidence presented by the defendants that a competent civil rights lawyer could have been hired to represent the

plaintiffs at a lower rate. The judge should not have ignored this evidence, for if it is credible then the award of attorneys' fees at Kirkland's normal billing rates might be an abuse of discretion even though there is no question that these *are* the normal billing rates of these lawyers.

The award of attorneys' fees must therefore be vacated and the matter returned to the district court for further proceedings consistent with this opinion. We do not prejudge those proceedings. We recently approved an award of $275 per hour for a civil rights lawyer, *People Who Care v. Rockford Bd. of Education, supra,* 90 F.3d at 1312, and it may be that Kirkland can justify an equivalent or even higher rate for its work in this case. That is for the district judge to decide in the first instance.

■ We are mindful that section 803(d) of the newly enacted Prison Litigation Reform Act of 1996, Pub.L. 104–134, 110 Stat. 1321 (1996), places limitations here exceeded on the amount of attorneys' fees that may be awarded in prison civil rights litigation. But we agree with the Eighth Circuit that this provision of the Act does not have retroactive effect. *Jensen v. Clarke,* 94 F.3d 1191, 1201–03 (8th Cir.1996). To give it such effect would attach (without clear indication of congressional intent to do so) new legal consequences to completed conduct, namely the services rendered by the plaintiffs' counsel in advance of the passage of the new Act. *Landgraf v. USI Film Products,* 511 U.S. 244, 269–70, 114 S.Ct. 1483, —— – ——, 128 L.Ed.2d 229 (1994); *Burris v. Parke,* 95 F.3d 465, 468–69 (7th Cir.1996) (en banc).

The award of damages is affirmed, however, and costs in this court are awarded to the plaintiffs.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.