In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 15-1411

TERRY DEETS,

*Plaintiff-Appellant,*

*v.*

MASSMAN CONSTRUCTION COMPANY, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-CV-883-NJR-PMF — **Nancy J. Rosenstengel**, *Judge*.

_____

ARGUED OCTOBER 6, 2015 — DECIDED DATE FEBRUARY 3, 2016

_____

Before WOOD, *Chief Judge*, and POSNER and WILLIAMS,
*Circuit Judges*.

WILLIAMS, *Circuit Judge*. Terry Deets, a white construction
worker, appeals the grant of summary judgment for his for-
mer employers in this suit asserting racial discrimination
under Title VII, 42 U.S.C. § 2000e–2, and 42 U.S.C. § 1981.
Because there is a factual dispute about the basis for Deets's
layoff, we reverse the district court's grant of summary
judgment and remand the case for further proceedings.

## I. BACKGROUND

This lawsuit involves Deets's employment relationship with Massman, Traylor, Alberici, a joint venture ("MTA") formed in 2009 by three construction companies—Massman Construction Company, Traylor Brothers, Inc., and Alberici Constructors, Inc.—to bid on a federally assisted project to build a bridge (the Stan Musial Veteran's Memorial Bridge) across the Mississippi River connecting St. Clair County, Illinois, to St. Louis, Missouri. In December 2009, MTA was awarded the contract by the Missouri Department of Transportation. MTA then entered into a collective bargaining agreement requiring it to hire operators for the project solely from two local branches of the International Union of Operating Engineers, Local 512 (for Missouri operators) and Local 520 (for Illinois operators).

### A. Terms of Collective Bargaining Agreement

The collective bargaining agreement provided that MTA would fill an open operator position by either asking the union for a referral or recalling a former employee it had hired from the union. (A union member was eligible for recall for 45 days after he was laid off by MTA.) Under the terms of the collective bargaining agreement, a worker acquired seniority on a machine—meaning that the worker had a right to continue working on that machine while it was in service—after he had worked on it for 3 consecutive days. A worker lost seniority on a machine if it was shut down for a week or longer. Project Superintendent John Todt and Project Manager Dale Helmig (both Massman employees) were responsible for all non-administrative staffing decisions.

The Missouri Department of Transportation's contract with MTA contained federally mandated goals for participation by minorities (14.7%) and women (6.9%) on the project. Participation MTA was required to make a good faith effort to meet the participation goals by, among other things, maintaining a harassment-free work environment, keeping a file of the names and contact information of minority and female referrals from the union, and developing on-the-job training opportunities that expressly included minorities and women. Because of its agreement with the operators' union, MTA also had to secure the union's cooperation "to increase opportunities for minority groups and women within the unions, and to effect referrals by such unions of minority and female employees." The contract also required MTA to adopt an equal-employment-opportunity policy and affirmative-action plan ensuring that employees would be treated without regard to race in all employment actions, including hiring, upgrading, demoting, laying off, firing, deciding rate of pay, and training. MTA's affirmative-action plan also acknowledged its duty to seek the union's cooperation in achieving minority hiring goals.

### B. Deets's Hiring and Layoff

MTA hired Deets, a member of the Illinois operators' union, on May 9, 2012, after the union had referred him as an oiler for a Manitowoc 2250 crane. As an oiler, Deets was responsible for fueling, oiling, and greasing the crane and ensuring that it operated safely. On May 17, Deets was laid off because of a lack of work. He was recalled on May 29 to work on the Manitowoc crane. On June 20, he was reassigned to work on a Liebherr crane, but by early July it became apparent that the Liebherr crane was going to go out of

service because of insufficient materials. In anticipation of the shutdown, Todt, the project superintendent, asked Deets if he was interested in filling in for the Tower crane oiler who would be going on vacation for two weeks. On July 5, Deets moved over to the Tower crane. The Liebherr crane continued to operate on July 5 and 6, and then went out of service.

On July 17, the day before the Tower crane oiler was set to return, Deets said that he was approached by Todt, who told him that he was being laid off at the end of the day. When Deets asked for a reason, he said that Todt told him "[m]y minority numbers aren't right. I'm supposed to have 13.9 percent minorities on this job and I've only got 8 percent." Later that day, when he collected his last paycheck, Deets said that he was told by Jim Rogier, a pier superintendent, that he was "sorry to hear about this minority thing." Also that same day, Brent McKinnon, a crane operator on the project, swore in an affidavit that Todt told him that he "would have to terminate Deets's 40-hour-minimum work week because there was an insufficient number of non-white workers at the Worksite." Deets acknowledged not being guaranteed any position on the project but said upon moving over to the Tower crane that Todt assured him that he could return to his position on the Liebherr crane as soon as materials for that crane became available—timing that would coincide with the return of the Tower crane oiler from vacation. On July 18, however, Todt filled the Liebherr crane oiler position by hiring Jesse Green, who is a racial minority.

Todt refuted Deets's recitation of events. Todt admitted that he and Helmig, the project manager, had decided earlier (on either July 14 or July 16) to request a minority union

member to fill the oiler position on the Liebherr crane when it came back into service. But Todt denied telling Deets that "minority numbers" were the reason for his layoff. Todt explained that he laid off Deets because there was no work: on July 17 Todt was not sure when the Liebherr crane would go back into service (and even if he had known, he said, he already had decided not to rehire Deets) and there was no other work available for Deets. According to Todt, Deets had no claim to work on the Liebherr crane because it was out of service for more than a week, so Deets was stripped of seniority. Todt decided to request a minority oiler to work on the Liebherr crane, because he had reviewed the labor reports for the project and discovered that, for the three weeks leading up to Deets's layoff, MTA had been out of compliance with its minority participation goals for operators. Todt admitted that replacing a white worker with a minority worker so that MTA could meet its minority participation goals would violate the affirmative-action plan and equal-employment opportunity policy. Todt called Deets later on the afternoon of July 17 and offered him the opportunity to fill in for other oilers on July 20 and 21.

After he was laid off on July 17, Deets continued to rotate through a series of short-term assignments, being laid off and recalled, until he was terminated from the project in December 2012. The result of his July 17 layoff, he says, was a drastic reduction in his work hours. Deets spent December, January, and part of February working towards certifications, and in February 2013 he told the union that he was out of work and wanted to be considered for other projects.

### C.  Prior Proceedings

After filing a charge of discrimination with the EEOC and receiving a right-to-sue letter, Deets filed this lawsuit alleging that he had been laid off because he is white, in violation of 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981. Deets sued MTA and each of its individual component companies asserting that he had been laid off "for no other reason than to create a position for an individual based on their minority status." He sought relief in the form of lost wages, back pay, front pay, lost fringe benefits, compensatory damages, and punitive damages.

The defendants moved for summary judgment, arguing primarily that Deets had not offered evidence of intentional discrimination. Even if Todt had mentioned minority numbers when he fired Deets, the defendants argued, that reference related to Todt's decision to request a minority oiler for the Liebherr crane, not his decision to fire Deets.

The district court granted the defendants' motion for summary judgment on both Deets's Title VII and § 1981 claims and in its opinion, concluded that Deets did not offer any direct "smoking gun" evidence that Todt fired him because of his race. The court agreed with the defendants that Todt's statement to Deets about "minority numbers" was not direct evidence of discrimination because it was not clear that the statement referred to Deets's layoff. Furthermore, the court determined that Deets's circumstantial evidence was unpersuasive. The context of Todt's and Rogier's statements to Deets demonstrated that the comments were directed at the likelihood of Deets's rehiring on the project, not his termination.

In addition, the court rejected Deets's argument that Green's immediate hiring was evidence that MTA's explanation for his layoff—lack of work—was pretextual because Todt and Helmig decided to hire Green before they terminated Deets, leaving no work available for Deets. The court also concluded that Deets failed to establish a prima facie case of discrimination under the indirect method of proof. There were no "fishy circumstances" present: Deets was hired and fired in accordance with the collective bargaining agreement, and his employment history with MTA demonstrated that it was common for workers frequently to be laid off and recalled.

Finally, the court granted the defendants' motion for summary judgment on Deets's § 1981 claim because it already had determined that Deets could not make out a prima facie case of discrimination. Deets had properly identified a contractual right, the court explained, but he provided no evidence of discrimination with which to survive summary judgment.

## II. ANALYSIS

### A. Sufficient Evidence to Support Title VII and Section 1981 Claims

On appeal, Deets argues that the district court erred when it granted the defendants' motion for summary judgment on his Title VII and § 1981 claims. The district court erred as a matter of law, he maintains, when it concluded that Todt's statement was not direct evidence of discrimination. And, Deets continues, the district court also overlooked a key piece of direct evidence—McKinnon's affidavit.

### 1.  Direct Evidence of Discrimination

Deets is correct that the district court erred as a matter of law when it determined that Todt's statement was not direct evidence of discrimination. "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Deets says that at the time that he was laid off he asked Todt, "[h]ow can you possibly lay me off?," and Todt replied, "[m]y minority numbers aren't right. I'm supposed to have 13.9 percent minorities on this job and I only got 8 percent." Based on Todt's statement, it does not take any inference to conclude that Deets was laid off because he was not a minority. That race was the factor that led to Deets's termination is clear on the face of Todt's statement. It is possible that a jury would credit Todt's denial that he ever made that statement, but that credibility determination may not be resolved at summary judgment. *See Darchak v. Chi. Bd. of Educ.*, 580 F.3d 622, 632–33 (7th Cir. 2009) ("Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless no rational factfinder could draw the contrary inference." (internal citations and quotation marks omitted).).

We are puzzled by the district court's conclusion that Todt's statement related directly to his decision not to rehire Deets rather than his decision to *terminate* Deets. True, in order for a statement to be probative of discriminatory intent, it must be "related to the employment decision in question." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (internal quotations marks omitted). But Todt made the statement at the time he informed Deets he was being laid

off, *see Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001) (explaining that a statement's "temporal proximity" to the adverse action "is often crucial" when determining whether statement qualified as direct evidence of discrimination), and directly in response to Deets's inquiry about the basis for his termination.

We are similarly puzzled by the defendants' contention at oral argument that the motivation behind Deets's layoff was immaterial because he was not entitled to work on the Liebherr crane when it went back into service. The parties do not dispute that Deets had lost seniority on that machine when it went out of service. But just because Deets was not *entitled* to that position does not permit MTA to lay him off because of his race. Title VII applies even to at-will employment and does not permit an employer either to fail to hire or to fire workers based on race. *See Green v. Am. Fed'n of Teachers/Illinois Fed'n of Teachers Local 604*, 740 F.3d 1104, 1105 (7th Cir. 2014); *Loucks v. Star City Glass Co.*, 551 F.2d 745, 747–48 (7th Cir. 1977).

The district court also erred when it failed to address McKinnon's affidavit. McKinnon swore that Todt told him on the day that Deets was laid off that an insufficient number of non-white workers was the reason for the termination of Deets's "40-hour-minimum work week." In its final order, the district court did not discuss McKinnon's testimony but, if true, it provides additional direct evidence that Todt laid off Deets because of his race.

### 2. Circumstantial Evidence of Discrimination

The district court also erred as a matter of law when it concluded that there was insufficient circumstantial evi-

dence to permit a reasonable juror to conclude that Deets was laid off because of his race. Deets assembled sufficient "scraps of circumstantial evidence" to allow the trier of fact to conclude that discrimination more likely than not lay behind the adverse action. *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). First there are the alleged statements by Todt (discussed above) and Rogier (telling Deets that he was "sorry to hear about this minority thing" when Deets went to pick up his last paycheck). Next, Todt fired Deets knowing that MTA had been out of compliance with its minority participation goals for three consecutive weeks. Third, MTA hired Green, who is a racial minority, to work on the Liebherr crane the day after terminating Deets. Finally, Deets offered evidence that Todt's explanation for his layoff—lack of work—was pretextual because he likely knew that the Liebherr crane was going back into service the next day at the time he fired Deets.

Because Deets's Title VII claim survives summary judgment, his § 1981 claim must also go forward. The parties do not challenge the district court's conclusion that Deets has properly identified a contractual right, and Title VII claims and § 1981 claims have the same liability standard. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

### B. Mitigation of Damages Determined after Liability

The defendants argue that they are entitled to judgment as a matter of law on Deets's wage-based damages claims because he failed to mitigate his damages by looking for other work after he was laid off. The defendants frame this argument as an affirmative defense to Deets's claim of un-

lawful discrimination. But the proper amount of damages—including whether Deets mitigated his damages—should be determined only *after* he establishes that the defendants unlawfully discriminated against him. *See, e.g., Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 460 (7th Cir. 2006); *Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994).

## C. Joint Venture Does Not Shield Defendants from Liability

The defendants also argue that the individual corporate entities—Massman Construction, Traylor Brothers, and Alberici Constructors—are entitled to summary judgment because none of them was Deets's employer; his employer was the joint venture. But the defendants have it backwards: the three individual companies formed a joint venture under a contract governed by the laws of Missouri. Under Missouri law, "[t]here is generally no essential difference between a partnership and a joint venture and they are governed by the same legal rules," *Binkley v. Palmer*, 10 S.W.3d 166, 169 (Mo. Ct. App. 1999) (internal citations omitted), and "a partnership is not regarded as a separate legal entity and cannot sue or be sued," *Sarasohn & Co., Inc. v. Prestige Hotels Corp.*, 945 S.W.2d 13, 16 (Mo. Ct. App. 1997). So Deets may not sue MTA, a joint venture. The defendants deny that any of the individual companies is Deets's employer, but that cannot be the case. One (or all) of the companies is liable under Title VII as Deets's employer, and there is a dispute of fact about which company or companies that is. *See Sklyarsky v. Means-Knaus Partners, LP*, 777 F.3d 892, 895–96 (7th Cir. 2015) (explaining that Title VII plaintiff can have joint employers). Moreover, the purported lack of an employment relationship

between Deets and the individual companies likely doesn't matter for purposes of Deets's claim under § 1981 because "a third party can be liable under § 1981 for *interfering* with the plaintiff's relationship with his employer." *Sklyarsky*, 777 F.3d at 896; *see Parker v. Scheck Mechanical Corp.*, 772 F.3d 502, 507 (7th Cir. 2014); *Shaikh v. City of Chicago*, 341 F.3d 627, 630–31 (7th Cir. 2003).

## III. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for further proceedings.