**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 20, 2017[*]
Decided September 21, 2017

**Before**

MICHAEL S. KANNE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 17-1734

| | |
|---|---|
| TRAVIS DELANEY WILLIAMS, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 2014-cv-1078-PP |
| DAVID STAUCHE, et al., *Defendants-Appellees*. | Pamela Pepper, *Judge*. |

**O R D E R**

Travis Williams was held overnight as a pretrial detainee at the county jail in Kenosha, Wisconsin, in August 2014. In this lawsuit under 42 U.S.C. § 1983, he principally claims that two guards gratuitously assaulted him. The district court dismissed this and other Fourteenth Amendment claims at summary judgment, reasoning in part that still images from surveillance cameras contradict Williams'

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. APP. P. 34(a)(2)(C).

allegation that he was assaulted. We disagree with this conclusion and remand for trial on the claim of excessive force.

Much of the evidence is disputed, and we recount it in the light most favorable to Williams, the opponent of summary judgment. *See Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 994 (7th Cir. 2016). Our review is de novo. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

Williams was being detained in Racine, Wisconsin, but on August 18 he was driven to the jail in Kenosha to await a court appearance. He arrived in a wheelchair wearing elastic bandages on his knees and compression socks. David Stauche, one of the defendant guards, rolled Williams to a bunk in the medical ward and told him to remove the bandages and socks because they had not been authorized by facility medical staff. Williams protested that medical providers at the jail in Racine had prescribed these items to support his knees and prevent painful swelling. He asked Stauche to share this information with the Kenosha medical staff, but Stauche did not. Williams then pleaded with Maxwell Isaac, another defendant guard, to return the bandages and socks. Isaac reacted by slamming doors as he moved about the ward. Eventually a nurse conveyed that Williams must surrender the wheelchair, too, except when being moved a significant distance. Williams refused to relinquish the chair, so Isaac said he would be reassigned to a regular cell.

Williams was handcuffed, and Isaac then wheeled him out of the medical ward with help from Stauche (and one other guard who is not a defendant). On the way out, according to Williams, Isaac intentionally rammed his legs into a table, two hospital beds, and a door frame. Isaac said, "Oops," yet the force of the collisions moved the occupied beds a couple feet. Then on the way to the cell Isaac slammed Williams into another door frame and several doors. Near the cell entrance Isaac "snatched" Williams from the chair—without first directing him to stand—and threw him against a wall. After a frisk, Isaac and Stauche lugged him into the cell and threw him to the floor. Isaac sat on him and aimed a pepper spray canister at his face while the handcuffs were removed. As we have said, this is Williams's version of events.

When Isaac and Stauche left, Williams overflowed the sink and flooded the cell to draw attention. A third defendant, guard Alvin Burdick, stopped to investigate the flooding. Williams explained he had been assaulted and needed medical help for cuts and puncture wounds on his legs. Burdick looked at Williams's legs and replied, "No one gives a fuck" and added, "I hope you die in that cell." He supervised other prisoners cleaning up the water and then left.

The next day Williams was pushed in his wheelchair to a vehicle and taken to court. Afterward he was returned to the jail in Racine. A nurse at that facility provided new bandages and compression socks, and two days later, medical staff documented a 2-inch, superficial cut on Williams's left thigh.

That is the gist of Williams's case. In the district court he made additional allegations against other guards and medical staff, and also alleged that Isaac had assaulted him again on August 19. But Williams has abandoned his assertions about the 19th and says little about the other jail employees he named as defendants. He has not developed any appellate claims about them, so we do not discuss them. As for Isaac, Stauche, and Burdick, the district court screened Williams's complaint, *see* 28 U.S.C. § 1915A, and understood him to be claiming that (1) Isaac and Stauche were deliberately indifferent to his need for elastic bandages and compression socks, (2) those two guards subjected him to excessive force, and (3) Burdick deprived him of medical attention after the assault. Although the district court did not lump Isaac and Stauche in the third claim with Burdick, those two guards have consistently interpreted the claim to include them. We follow their lead. Williams was a pretrial detainee, so all of these claims arise under the Due Process Clause of the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015); *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017).

During discovery the defendants gave Williams a compilation of silent, still-frame surveillance images purportedly captured during the cell transfer at intervals of at least 6 seconds. But many of the gaps are longer, and most images bear the date "0/10/2014" rather than "08/18/2014." Williams was imprisoned in a state facility when the defendants tendered a DVD with these images. In asking the district court to recruit a lawyer to assist him, Williams represented that staff at his prison had thwarted him from viewing the surveillance images and, in fact, had destroyed the DVD. He argued that this interference warranted appointing counsel, but the district court misunderstood Williams as saying he was having difficulty accessing the DVD, not that it had been seized and destroyed. The court reasoned that Williams had participated fully in discovery and prepared lucid and detailed filings and, on that basis, declined to assist him in finding a lawyer.

At summary judgment, the three guards contradicted Williams's account of events. Isaac and Stauche denied that Williams had disclosed the cause or extent of his injuries requiring special bandages and socks. They also denied roughing him up or pushing his wheelchair into anything. To the contrary, they said, Williams had shouted

threats and used his feet to impede being wheeled from the medical ward to his cell. As proof that Williams was not mistreated, the two guards introduced the surveillance images—without explaining the date and time discrepancies. For his part, Burdick denied making the impertinent statements attributed to him. He explained that, after Williams asked to see a nurse, he concluded from personal observation that Williams did not require emergency medical attention. Williams's evidence was limited to his own sworn statements. And he asserted that the defendants had unfairly submitted only those surveillance images favoring them.

In ruling against Williams on all claims, the district court first reasoned that he lacks evidence of a serious medical condition *necessitating* use of elastic bandages and compression socks. The judge recognized that medical staff at the jail in Racine had given these items to Williams. She also acknowledged that, upon arriving at Kenosha, Williams had self-reported previous knee surgeries and hip problems. What is missing though, the court continued, is evidence linking the bandages and socks to the surgeries or any other medical condition.

Second, the district court concluded that the claim of excessive force against Isaac and Stauche must be dismissed because, the court said, jurors who see the surveillance images (which the court characterized as video clips) would be unable to reasonably find that the guards had subjected Williams to objectively unreasonable force. Although Williams had suggested the images were "cherry-picked," the court rejected this possibility because *Williams* had not offered proof of manipulation. The sequence of images does not even begin until Williams is out of the medical ward—where, he avers, the greatest abuse occurred. And the sequence ends outside his cell where, Williams adds, the guards threw him to the floor. According to the judge, the available images do not show Williams's wheelchair colliding with objects in the corridors. Rather, the judge opined, the images evidence an "uneventful" trip during which Williams appears calm and uninjured. If Williams is telling the truth, the court reasoned, he would have come away with more than a single 2-inch scratch on his thigh. Given this minimal injury and the guards' "professional behavior" as seen on the surveillance images, the judge reasoned that a jury could not reasonably find that Isaac and Stauche abused Williams when out of camera range.

Last, the district court concluded that, on this record, a jury could not find that Burdick deprived Williams of due process by not getting him medical care after the assault. The court reasoned that Williams's only documented injury—a superficial cut that healthcare providers at Racine treated with antibacterial ointment—was not an

objectively serious medical condition that could support a claim of deliberate indifference. The judge did not mention Isaac and Stauche in analyzing this claim.

On appeal Williams challenges the dismissal as to all three claims. He also contends that the district court committed a number of procedural errors.

To start, we reject Williams's contention that Stauche and Isaac violated the Constitution by taking his bandages and socks. Williams focuses on whether the guards were complying with jail policy or following instructions from medical staff, but this misses the point of the district court's order. What is lacking, the court said, is evidence linking the bandages and socks to an objectively serious medical condition. We agree with that assessment. Without evidence that the bandages and socks had been prescribed to alleviate suffering from an objectively serious medical condition, Williams could not survive summary judgment on his claim of deliberate indifference. *See Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015); *Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007). Thus, the dismissal of this claim was appropriate.

This same logic defeats Williams's claim that Burdick (as well as Isaac and Stauche) could be liable for not alerting medical staff about his injuries from the alleged assault. Here, again, a *constitutional* claim for the denial of medical care must start with an objectively serious medical condition, and we agree with the district court that Williams did not introduce evidence of injuries satisfying this standard. True, he says he protested to the defendants about multiple cuts and even puncture wounds, and, for purposes here, we assume that Williams did complain. Yet, when Williams returned to the jail in Racine, he promptly submitted a request for replacement bandages but did not seek medical attention for cuts or puncture wounds to his legs. It was not until two days after the assault, on August 20, that Williams first mentioned new injuries in a sick-call request. And the evidence is undisputed that, when medical providers examined Williams the next day, they found only a single superficial cut, not indications of puncture wounds or deep lacerations. That scratch, like scraped elbows, swollen cheeks, split lips, and lacerations not requiring stitches, was insignificant as a matter of due process. *See Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006); *Davis v. Jones*, 936 F.2d 971, 973 (7th Cir. 1991); *Lockett v. Suardini*, 526 F.3d 866, 877 (6th Cir. 2008). And though significant, prolonged pain might itself constitute an objectively serious medical condition, *see Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015) (pain from untreated abscessed tooth); *Perez v. Fenoglio*, 792 F.3d 768, 774, 777–78 (7th Cir. 2015) (pain from untreated, gaping wound that dislocated thumb and tore ligament), Williams suffered a scratch. *Cf. Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir.

1996) (upholding verdict on claim of deliberate indifference against multiple guards who beat, kicked, and maced inmates and afterward refused medical attention for severe muscular pain, cuts, and burning sensation in eyes and skin from mace).

That Williams suffered only minor injuries, however, does not get Isaac and Stauche off the hook for the alleged assault. To prevail on a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2472–73. "[O]bjective reasonableness turns on the facts and circumstances of each particular case," including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. at 2473 (quotation marks and citation omitted). The absence of significant injury will not defeat a claim of excessive force. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992); *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

The district court erred in dismissing this claim, which, at its core, turns on the credibility of Williams, Isaacs, and Stauche. Questions of credibility are for the finder of fact, not the judge when ruling on a motion for summary judgment. *E.g., Deets v. Massman Const. Co.*, 811 F.3d 978, 982 (7th Cir. 2016). Williams submitted statements in the form of declarations, *see* 28 U.S.C. § 1746, attesting that he never resisted while being moved from the medical ward to a cell; that Isaac and Stauche gratuitously rammed his wheelchair into eight different objects, twice with enough force to move an occupied bed several feet; and that the guards yanked him from the chair without first asking him to stand, slammed him into a wall, and ultimately dumped him unceremoniously onto the cell floor. Williams may be lying; the guards say he is. They do not contend, however, that they bumped Williams's wheelchair into beds and doors incidentally to using reasonable force to accomplish their mission. Instead they deny entirely Williams's statements, and if a jury should credit his testimony, then he will have all the evidence needed to prevail on his claim of excessive force.

This straightforward analysis got sidetracked by the defendants' insistence at summary judgment that their surveillance images disprove Williams's allegations. If that were true, we would uphold the district court's ruling, because we have held that a district court should reject the nonmoving party's version of events "when that version is blatantly contradicted" by video evidence. *Williams v. Brooks*, 809 F.3d 936, 942

(7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)). But there are two problems with the district court's application of this principle.

First, the defendants did little to satisfy the threshold for admission of the surveillance images. Those images are contained within 15 different clips, and each clip begins with an image dated "0/10/2014"; some clips have images that change from this date to "08/18/2014" between frames. Often the images are time-stamped 6 or 7 seconds apart, but between several clips there are gaps in images that last from 20 seconds to several minutes. And in most clips the person sitting in the wheelchair—if a wheelchair is visible at all—is unidentifiable. The jail employee who submitted an affidavit sponsoring the surveillance clips does not purport to have personal knowledge of those clips. He says they contain true copies of surveillance images from the 18th, but that is as far as he goes; the date discrepancies and gaps in time are not explained. *See generally United States v. Cejas*, 761 F.3d 717, 723-25 (7th Cir. 2014); *Griffin v. Bell*, 694 F.3d 871, 82627 (7th Cir. 2012). These discrepancies shed light on Williams's assertion that the defendants "cherry-picked" the images they submitted, but instead of recognizing that it was the defendants' burden to authenticate the images they offered, the district court faulted Williams for not proving his contention.

More importantly, though, the district court's assessment of the surveillance images is inaccurate. For several portions of the transfer, the defendants did not submit any surveillance images (perhaps those areas do not have cameras, but, here again, the sponsor of the clips is silent). The medical ward is the most glaring omission, which the court minimized by saying that Williams's only allegation about that location is that he was handcuffed too tightly. That is incorrect. It was in the medical ward, according to Williams, that Isaac rammed his legs into two beds, a table, and a doorway. Also out of view—at least in the images the defendants submitted—are doorways they passed through on the way to the cell, the wall that Williams allegedly was thrown against to be frisked, and the inside of the cell where Williams purportedly was thrown to the floor. The district court also asserted that "nowhere on the clips does the wheelchair come into contact with anything other than the floor as it moves along." That, too, is incorrect; in one clip it appears that the wheelchair is the *only* thing against a door that Williams had passed though in front of any visible guard. After viewing the surveillance recordings, a reasonable jury could believe at least some of Williams's assertions about the misuse of force by the defendants. And although Williams's cut to his leg was minor, it substantiates his statement that some force occurred off camera.

It follows that this claim against Isaac and Stauche must proceed to trial. They assert that qualified immunity provides an alternative basis to uphold the dismissal of Williams's excessive-force claim, but this contention is frivolous. That guards cannot gratuitously abuse prisoners is clearly established. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009); *Cooper*, 97 F.3d at 917.

That leaves Williams's procedural claims, but only one merits discussion. Williams argues that the district court erred in refusing to recruit a lawyer for him. We acknowledge that, in declining to recruit counsel, the judge mistakenly thought Williams was having difficulty viewing the surveillance images when, in fact, staff at his prison apparently had destroyed the DVD. The defendants talk around this misunderstanding, but, even so, we will not overturn a refusal to recruit counsel unless the pro se litigant suffered prejudice. *See Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) (en banc). Williams says that counsel would have helped refute the defendants' reliance on the surveillance images, but since we are remanding for trial on his claim of excessive force, Williams has not been prejudiced. Moreover, we have said that district courts ordinarily should recruit counsel for a pro se litigant whose case will proceed to trial, *see Perez*, 792 F.3d at 785, and that general rule has particular import in this case because—if the surveillance images are admissible at all—Williams must be able to challenge their evidentiary value. Thus, on remand the district court should reassess the need for counsel to represent Williams.

Accordingly, we VACATE the entry of summary judgment on Williams' claim that guards Isaac and Stauche assaulted him on August 18, 2014. That claim is REMANDED for trial. In all other respects the judgment is AFFIRMED.